**DODGE BROTHERS, Inc., v. UNITED STATES (four cases).**

**Nos. 4722–4725.**

Circuit Court of Appeals, Fourth Circuit.

March 10, 1941.

John W. Drye, Jr., of New York City (Larkin, Rathbone & Perry and T. R. Iserman, all of New York City, and Hershey, Donaldson, Williams & Stanley, Albert E. Donaldson, and Raymond S. Williams, all of Baltimore, Md., on the brief), for appellant.

Milford S. Zimmerman and Arthur L. Jacobs, Sp. Assts. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., and Bernard J. Flynn, U. S. Atty., and G. Randolph Aiken, Asst. U. S. Atty., both of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Dodge Brothers, Incorporated (hereinafter called appellant), instituted four suits, in the order in which they are numbered, for the recovery of $374,682.15, $545,666.94, $947,623.80, and $498,657.85, as alleged overpayments of federal income taxes for the taxable years 1925, 1926, 1927 and 1928, respectively. The actions arose under the Revenue Acts of 1926 and 1928, 26 U.S.C.A. Int.Rev.Acts, pages 145 et seq., 351 et seq., and, because the taxes in question were paid to a former Collector who was not in office when the suits were begun, were brought against the United States of America (hereinafter called appellee). See 28 U.S.C.A. § 41 (20). From the District Court's judgments in favor of appellee, (33 F.Supp. 312), appellant brought these appeals. The four cases by agreement were tried together and were consolidated for argument before this Court.

John F. Dodge and Horace E. Dodge, as partners, established a machine-shop in Detroit in 1900. From 1903 to 1914, the partnership manufactured automobile parts for the Ford Motor Company. In 1914, however, the Messrs. Dodge decided to manufacture and sell an automobile of their own make and, accordingly, incorporated the company of Dodge Brothers in the State of Michigan on July 7, 1914. Until their deaths in 1920, they wholly owned and personally managed the business of the corporation which consisted primarily of the manufacture and sale of the Dodge 4-cylinder automobile. After their deaths, the stock in the corporation passed to their respective estates.

On May 1, 1925, an underwriting syndicate of bankers, headed by Dillon, Read & Company (hereinafter called D. R. & C.), purchased all the assets of Dodge Brothers for $146,000,000 in cash. D. R. & C. then organized in Maryland the appellant corporation and sold to it the recently-acquired assets of Dodge Brothers in exchange for: (1) a payment by appellant of $14,000,000 in cash; (2) the issuance to D. R. & C. of substantially all appellant's debentures and stock; and (3) the assumption by appellant of all the liabilities of Dodge Brothers. Since appellant paid the $14,000,-000 in cash out of the assets received, the net market value and cost of the assets of Dodge Brothers was $132,000,000. Of this latter sum, it is agreed that $81,913,473.62 represented the value of the so-called tangible assets (viz., cash, securities held, notes and accounts receivable, investment in inventories, land, buildings, machinery and equipment). Although the item of "Good Will" had formerly been carried on the books of Dodge Brothers at the nominal valuation of one dollar, appellant, under the terms of this sale, had apparently become the owner of intangible assets of an approximate value of $50,000,000.

In fulfilling its obligations under the purchase contract, appellant issued to D. R. & C. the following securities:

(a) $75,000,000, principal amount of 6% Sinking-Fund Gold Debentures;
(b) 850,000 shares of Preference Stock, without par value;
(c) 1,500,000 shares of Common Stock Class A, without par value;
(d) 500,000 shares of Common Stock, Class B, without par value.

The underwriting group organized several selling syndicates which, in turn, sold all of the debentures and a very large part of the stock to the public. The debentures were offered and sold to the public at 99; the preference stock, each share carrying with it a bonus of one share of Class A common stock, was offered and sold as a unit at 100; the preference stock was sold on the New York Stock Exchange at about 75; while the Class A common stock was sold on the Curb Exchange at about 25. The Class B common stock was not sold to the public, but since, in addition to all the rights of the Class A stock it had also voting rights, it may fairly be presumed to

have had at least the same value as the Class A stock. In short, the public market value of the securities issued originally by appellant aggregated about $190,500,000, and the underwriting group, in addition to the retention of a large part of the more valuable common stock, realized a rather sizeable profit of more than $20,000,000.

On June 30, 1928, appellant's entire business was sold to the Chrysler Corporation, a manufacturer and seller of motor cars. The sale was completed by an exchange of Chrysler stock for Dodge stock in the proportion of one share of Chrysler for one share of Dodge preference stock, one share of Chrysler for five shares of Dodge Class A common stock, and one share of Chrysler for ten shares of Dodge Class B common stock. Chrysler assumed the liability of the debentures, all of which were eventually retired, either by conversion through the sinking fund or by call and payment by Chrysler. The Chrysler Corporation received all of appellant's assets, and continued the manufacture and sale of the Dodge car. Although the corporate identity of appellant has been continued, appellant has engaged in no active business since July 30, 1928.

For the years 1925 to 1928 inclusive, appellant made the necessary income tax returns and, in turn, duly paid the amount of taxes shown thereon, a sum of about $6,500,000. In the current course of the audit of appellant's returns by the Commissioner of Internal Revenue, various corrections and adjustments were made, resulting in a determination by the Commissioner of a deficiency for the year 1925 of $477,-647.95, and an overassessment for the years 1926, 1927 and 1928 of an aggregate sum of $922,198.99. During the negotiations between appellant and the Commissioner, appellant for the first time made two additional claims: (1) that in appellant's purchase of all the assets of Dodge Brothers on May 1, 1925, appellant had "acquired for a part of the purchase price the model and design of the Dodge 4-cylinder automobile, which was a depreciating asset, the cost of which was deductible over its estimated life;" and (2) that appellant "was entitled to deduct from its gross income the amount of the discount applicable to the years 1925 to 1928, inclusive, at which it claimed its 6% Sinking Fund Gold Debentures were issued." Appellant's claim (1) for depreciation (in the nature of obsolescence) and its claim (2) for amortization of the bond discount were both rejected by the Com-

missioner. After appropriate petitions for refund were filed and, later, rejected, these suits were instituted.

## The Depreciation Issue

The corporation of Dodge Brothers, formed in July, 1914, had for its policy the manufacture and sale of a single model of automobile. It was the opinion of the owners of the corporation that this method of operation would be both cheaper and more efficient than either the making of several models simultaneously or the making of radical changes on a model from year to year. Hence, after careful experimentation and testing, a single-model 4-cylinder car was produced for sale in November, 1914. The corporation consistently adhered to the original plan of manufacture and sale and the Dodge Brothers motor cars were, thus, described by consecutively-running serial numbers and not by year or model designations. It is stipulated that up to May 1, 1925, changes in the Dodge car were made so gradually from time to time that units manufactured in each successive year were substantially similar to those made in the preceding year.

Dodge Brothers advertised its products extensively, always emphasizing the car's stable design. Notwithstanding the fact that other automobile manufacturers, with the exception of Ford, followed the policy of introducing yearly models, the automobile buying public became thoroughly familiar with the characteristics of the Dodge Brothers motor car and with the fixed policy of the corporation. This car became known as the "utility motor car." Appellant describes this car as the "proved car."

Up to, and after, May 1, 1925, the Dodge car enjoyed tremendous popularity and brought large profits to the Dodge corporation. Nevertheless, about this date, there was a marked trend towards the use of 6-cylinder cars in the Dodge's competitive field. Appellant maintains that the Dodge executives had "actually foreseen" that eventually a time must come when the 4-cylinder Dodge could no longer be made and sold profitably. But the uncertainty of the corporation's future policy is strongly indicated by the history of appellant's manufacturing program subsequent to May 1, 1925 (Appellee's Brief pp. 4, 5):

"Up to January, 1927, all passenger automobiles manufactured and sold by the appellant had four cylinders. On January 3,

1927, appellant began to produce a Dodge four cylinder automobile with a redesigned motor, known as the '126.' On January 8, 1927, a Dodge six cylinder passenger automobile was announced to the public, termed the 'Dodge Senior 6.' In April, 1927, the appellant offered for sale a four cylinder passenger automobile with a new motor, known as the '124.' In July, 1927, the appellant offered for sale a four cylinder passenger automobile known as the '128.' In December, 1927, a Dodge six cylinder automobile was offered for sale to the public, termed the 'Dodge Victory Six.' In March, 1928, the appellant offered for sale a Dodge six cylinder automobile known as the 'Dodge Standard Six.' The appellant continued to manufacture and sell the Dodge four cylinder passenger automobile until March, 1928. After that date, sales thereof continued in small quantities until the supply was exhausted."

At all events, it was not until September, 1927, that appellant definitely decided that the 4-cylinder car would be replaced by the "Dodge Standard Six," a light 6-cylinder car. The production of the 4-cylinder car was finally abandoned in March, 1928, at the time that the Standard Six was introduced.

Appellant contends that as of May 1, 1925, the Dodge car was a wasting asset; that at that date its reasonably remaining economic life was not in excess of four years; that at that date appellant had reasonably estimated the remaining economic life of the car; and that, therefore, appellant should be allowed to amortize the cost of this asset over the expected life of the car. The exact position of appellant is succinctly stated in paragraph 36 of the stipulation of facts:

"The plaintiff contends that the Dodge four-cylinder passenger automobile manufactured and/or sold by Dodge Brothers and by Dodge Brothers, Inc., from 1914 to 1928 was a 'proved car', and that said 'proved car' was one of the assets transferred and conveyed to it by Dodge Brothers on May 1, 1925, and that the cost basis to it of said 'proved car' was, under the Revenue Acts of 1926 and 1928, $10,000,000.

"The plaintiff further contends that it is entitled to deductions on account of the de-

preciation and obsolescence of said 'proved car' in the taxable years 1925, 1926, 1927 and 1928."

Appellee denies that appellant is entitled to any deduction whatsoever in connection with the "proved car."

Depreciation is specifically recognized as a proper deduction from gross income in both the Revenue Act of 1926, 26 U.S.C.A. Int.Rev.Acts § 234(a) (7), pp. 185, 187, and the Revenue Act of 1928, 26 U.S.C.A. Int. Rev.Acts § 23(k), pp. 356, 358. Those Acts provide that in the computation of net income, there shall be allowed as a deduction: "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." Articles 161, 162, and 163 of Treasury Regulations 69 (relating to the Revenue Act of 1926), dealing specifically with the depreciation of intangible property, are the regulations most applicable to the instant case. Article 163 is quoted for its particular pertinence:

"Art. 163. *Depreciation of intangible property.*—Intangibles, the use of which in the trade or business is definitely limited —in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. *No deduction for depreciation, including obsolescence, is allowable in respect of good will.*" (Italics ours.)[1]

Inasmuch as the income tax statutes have frequently been reenacted since the publication of these regulations, the regulations may be regarded as having the tacit approval of Congress. See Murphy Oil Co. v. Burnet, 1932, 287 U.S. 299, 307, 53 S.Ct. 161, 77 L.Ed. 318; United States v. Cerecedo Hermanos y Compania, 1908,

[1] The italicized final sentence of Article 163 was the result of an amendment of August 5, 1927, by Treasury Decision 4055, VI-2 Cum.Bull. 63. That Treasury Decision merely was a specific declaration of the already existing interpretation by the Commissioner.

209 U.S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821; and cf. McCaughn v. Hershey Chocolate Co., 1931, 283 U.S. 488, 492, 493, 51 S. Ct. 510, 75 L.Ed. 1183.

■ Although we obviously recognize the applicability of the above-cited statute to the intangible properties of a given corporation, we have encountered no little difficulty in determining the exact nature of the particular intangible concerning which appellant seeks the instant depreciation. Appellant emphasizes in its reply brief that it "does not claim depreciation upon the public acceptance of the car;" *but* "it does claim depreciation upon the model and design of the car." Appellant reiterates in this same brief that the depreciation it seeks is upon an intangible asset. It admits that the Commissioner has already allowed full depreciation on the *physical* tools and equipment—special tools, jigs, fixtures, dies, drawings, patterns and models—which were necessary for the utilization of the intangible creation. Appellant further admits that it has been allowed full deductions for its expenses in connection with the design, experiment, and development of its products. But it nevertheless insists that no deduction has yet been allowed for the obsolescence of the intangible asset inherent in the model or design of the "proved car," the value of which is based, not upon any physical elements, but rather upon the foresight and ingenuity of the creator.

Appellant indicates that the assets of Dodge Brothers which it had acquired from D. R. & C. had a net market value of $132,000,000. The value of the so-called tangible assets was $81,913,473.62. The intangibles, therefore, must have had a valuation of approximately $50,000,000. Appellant recognizes that a substantial part of the $50,000,000 is allocable to good will; but it maintains that, out of this sum, $10,000,000 is representative of the cost of the model and design of the "proved car." The value set by appellant on the model and design was approved by three of appellant's witnesses, men who had had long experience in the automotive industry.

Article 163 of Treasury Regulations 69, supra, provides that an intangible asset may be subject to a depreciation allowance, where its use in a business is definitely limited. As a condition precedent to receiving this deduction, the taxpayer must show: (1) that the intangible asset was acquired through a capital outlay; (2) that the asset is "known from experience to be of value in the business for only a limited period;" and (3) that the length of this period "can be estimated from experience with reasonable certainty." The regulation then specifically states, and this is unanimously supported by the decisions, that "No deduction for depreciation is allowable in respect of good will." See Clarke v. Haberle Crystal Springs Brewing Co., 1930, 280 U.S. 384, 50 S.Ct. 155, 74 L.Ed. 498; Red Wing Malting Co. v. Willcuts, 8 Cir., 1926, 15 F.2d 626, 49 A.L.R. 459, certiorari denied, 1927, 273 U.S. 763, 47 S.Ct. 476, 71 L.Ed. 879.

Judge Chesnut, in his opinion filed in the District Court, held that the intangible asset of the model and design of the "proved car" was only a part of the good will purchased by appellant and that the depreciation thereof was, accordingly, not deductible. 33 F.Supp. at page 318. We agree with Judge Chesnut here and we believe that, on this point, the evidence amply supports both his findings of fact and his conclusions of law.

■ It has long been settled that the depreciation or obsolescence of good will is not a deductible item in the computation of a taxpayer's net income. Clarke v. Haberle Crystal Springs Brewing Co., supra; Red Wing Malting Co. v. Willcuts, supra. See also Art. 163, supra. This form of deduction has been denied because of the manifest difficulties inherent in the computation of both the life span and the value of this intangible asset. In fact, good will, in any practical sense, has no terminable life; but, rather, it continues in existence just so long as the business continues, and its value fluctuates in direct relationship with the annual variations in the profits of the business with which it is associated. Good will cannot be carved out of a business and sold independently of the going concern; for its tangibility and its value exist only to the extent that such tangibility and such value are connected with a going business. See Metropolitan National Bank v. St. Louis Dispatch Co., 1893, 149 U.S. 436, 446, 13 S.Ct. 944, 37 L.Ed. 799, citing Story on Partnerships § 99; Betts v. United States, 1926, 62 Ct. Cl. 1, 8.

As is indicated in appellant's original brief, all the assets acquired by appellant on May 1, 1925, were purchased in bulk for a single total consideration. No specific amount, no part of the purchase

price, was earmarked or set aside for the purchase of any particular specific asset, tangible or intangible. Yet, appellant asserts that from an unidentified $50,000,000, which amount normally would find its place on the balance sheet as "good will", a sum of $10,000,000 may be separated as the value of the intangible asset in question, the "proved car". But how does appellant determine the value of this intangible? Appellant does not refer to the value of the physical models, designs, blueprints or drawings of the "proved car"; for depreciation has already been allowed on these tangibles. Also, appellant does not refer to the accumulative expenditure of $2,600,000, which was incurred by appellant's predecessor in designing and developing the "proved car"; since deductions have also been allowed on this item on an annual expense basis. A valuation of $10,000,000 apparently is reached by capitalizing the increased profit which was reasonably anticipated through the use of the model and design of an already "proved car". Appellant states in its brief that:

"It acquired this asset with its value tremendously enhanced by the knowledge and assurance that that car was then capable of earning profits of around $20,000,-000. a year. It acquired a design of a motor car that already had public acceptance. If it reasonably could be expected that that car, making such profits, would have an economic life of at least two years from the date of purchase, the appellant contends that the car was then worth at least $10,000,000. If a longer life were ascribed to it, the value would, of course, be increased."

A valuation based upon the capitalization of the average of a company's earnings over a number of years smacks peculiarly of a method used in evaluating good will.

In concluding that the "proved car" was not a properly depreciable asset, Judge Chesnut stated in his opinion (33 F.Supp. at page 318):

"If it be assumed that the taxpayer's conception of what constituted the 'proved car' may be regarded as intrinsically an item of intangible property, it is really inseparable from good-will in this case. It is important, of course, to have clearly in mind what the 'proved car' really is. The term does not refer to any particular tangible automobile but only to the design or model of an automobile. The expression really denotes not the actual product made but rather the qualities of that product in popular estimation; or, in other words, it means that the public approved the Dodge four-cylinder car as evidenced by its purchase in large quantities over a period of years. The fact that the Dodge corporation as a going concern put out a product which had enjoyed popular approval for a period of years of course gave promise that under unchanged conditions it would continue to have large net profits which would be realized through the continued popular approval and purchase of the same product. But this is only the long accepted legal meaning of the term 'good-will' which, as was said by Lord Eldon in Cruttwell v. Lye, 17 Ves. 335, 346, is 'nothing more than the probability that the old customers will resort to the old place.'"

In acquiring the model and design of the Dodge car, the appellant had secured a "reasonable expectancy of preference in the race of competition." See Mr. Justice Cardozo in Re Brown, 1926, 242 N.Y. 1, 150 N.E. 581, 582, 44 A.L.R. 510. Such purchase, when viewed singularly, can be regarded as merely an acquisition of one of the many elements of the seller's total good will.

We have considered three of the cases cited by appellant with particular care. See Essex Motors v. Commissioner, 1931, 22 B.T.A. 804; Perine Machinery Co. v. Commissioner, 1931, 22 B.T.A. 450; Pennsylvania Salt Mfg. Co. v. Commissioner, 1930, 18 B.T.A. 1148. Without going into the merits of these cases, we believe that all three are clearly distinguishable from the instant case. In all three cases there was present, too, the idea of a specific purchase of a definitely earmarked item. There was present in each of these cases an isolated asset, the useful life of which could be reasonably estimated, and the value of which was reasonably certain. These cases did not have, as the instant case *does* have, the presence of a bulk purchase of assets with an unidentified sum allocable to good will. The very idea of the possibility of splitting good will into its component parts, in an attempt to secure a deduction from gross income, has very recently been denied in United States Industrial Alcohol Co. v. Commissioner, Nov. 28, 1940, 42 B.T.A. 1323. The problem involved in the United States Industrial Alcohol case was reduced to a simple question (42 B.T.A. at page 1345):

102

"Where a going business is purchased, the buyer acquiring good will along with other assets, do orders on the seller's books constitute a divisible asset capable of separate valuation, or are they merely the current evidence of a continuing operation, the value of which is included in 'good will' and without which it would be evident that no 'good will' existed?"

In answering this question in favor of the Commissioner, the Board of Tax Appeals concluded (42 B.T.A. at page 1346):

"Since the contracts were merely the embodiment of such good will in so far as current business was concerned, and, since good will is not depreciable property, we conclude that the asset which petitioner seeks to depreciate, being but a part of a larger whole not subject to depreciation, was not susceptible of such treatment."

The term "proved car" appears to have been evolved by one of appellant's expert tax accountants. This name, and the philosophy and theory underlying it, are ingenious and plausible. Yet we believe that, for the purposes for which appellant contends, the existence, apart from good will, of the "proved car" is almost as mythical as Santa Claus or Jack Frost, almost as illusory as general prosperity. Deductions, under federal tax statutes, are based on hard facts and stern realities, not on myths and illusions.

We believe that the model and design purchased by appellant was merely one of the manifestations of the good will of appellant's predecessor—a manifestation which any purchaser of an established automotive manufacturing company would reasonably expect to find among all the purchased assets. In the light of this conclusion, we need not consider the other questions raised by appellee on this same point.

### The Amortization Issue

 Appellant contends that in the purchase of the Dodge Brothers' assets on May 1, 1925, it had issued its debentures at a discount; and that it was therefore entitled to deduct from its gross income the amount of this discount applicable to the years 1925 to 1928 inclusive. It has already been indicated above that, in addition to the payment of $14,000,000 in cash and the issuance of different classes of stock, appellant had issued $75,000,000 in 6% Gold Debentures. Based upon the values maintained in the sales subsequently

made by the underwriting syndicate the *public market value* of appellant's securities may be said to have totalled about $190,500,000. Appellant had previously alleged in its petition to the District Court that, in exchange for $132,000,000 in tangible and intangible assets, it had issued securities of a *fair market value* of $190,500,-000. However, the District Judge stated in his opinion that the public market value of the securities, created after the original issuance by appellant, was "not necessarily a fair measure of value for the aggregate of all the securities when first issued." 33 F.Supp. at page 322. Hence, on this appeal, appellant makes the contention that the minimum market prices shown by the instant record totalled $167,900,000, of which $74,250,000 was represented by debentures. These figures were reached by adhering to the following schedule (but cf. Helvering v. Safe Deposit & Trust Co., 4 Cir., 1938, 95 F.2d 806, 812; Commissioner v. Shattuck, 7 Cir., 1938, 97 F.2d 790, 792):

| | |
|---|---|
| Debentures, $75,000,000 principal amount @ 99 | $ 74,250,000.00 |
| Preference stock, 850,000 shares @ 75 | 63,750,000.00 |
| Class A Common Stock, 1,500,000 shares @ $14.95, as fixed by Appellee in determining tax liability of D. R. & C. | 22,425,000.00 |
| Class B Common Stock, 500,000 shares @ $14.95, as fixed by appellee in determining tax liability of D. R. & C. | 7,475,000.00 |
| Total | $167,900,000.00 |

On the basis of this schedule, appellant maintains that all the securities were issued at a discount of $35,900,000 ($167,900,000 less $132,000,000); that the total discount should be proportionately distributed over the debentures and stocks; that the particular discount allocable to the debentures was $16,625,976.94. Cf. Hummel-Ross Fibre Corp. v. Commissioner, 4 Cir., 1935, 79 F.2d 474; Pierce Oil Corp. v. Commissioner, 1935, 32 B.T.A. 403, 420. Appellant then makes specific claims of amortization of the discount allocable to the debentures of each of the taxable years here involved.

As an alternative to the foregoing claim for amortization, appellant contends that it should be allowed to amortize a discount of 5%—comprised of a discount of 1% at which the debentures were sold to the public by the underwriters, the commission of 3% paid to the selling agents, and an added charge of 1% for a reasonable underwriting fee. This alternative contention is based upon the assumption that if the underwriters had purchased only debentures, and

if this purchase had been made for cash, it would have been necessary for the underwriters to have purchased the debentures at not more than 95 in order to meet this sales program.

Both the Revenue Act of 1926, 26 U.S. C.A. Int.Rev.Acts, § 234(a) (2), (4), p. 186 and the Revenue Act of 1928, 26 U.S. C.A. Int.Rev.Acts § 23(b), (f), pp. 356, 357, provide that a deduction shall be allowed both for interest paid or accrued within the taxable year and for losses sustained during the taxable year. No express provision is made in either statute permitting a deduction for the discount at which corporate obligations are sold. However, the authority for the deduction for amortization of bond discount is found in the Treasury Regulations applicable to the two Revenue Acts in question. (See Art. 68, Treas.Reg. 74, issued under the Revenue Act of 1928; Art. 545, Treas.Reg. 69, issued under the Revenue Act of 1926):

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

The taxpayer is thus permitted to deduct annually, as a "loss", the amortization of the discount over the life of the bond. Helvering v. Union Pacific R. Co., 1934, 293 U.S. 282, 284-287, 55 S.Ct. 165, 79 L.Ed. 363.

We might agree to the proportional distribution of the total discount between the bonds and stocks (Hummel-Ross Fibre Corp. v. Commissioner, supra; Pierce Oil Corp. v. Commissioner, supra); also, we are not prepared to lay down any universal proposition that where bonds are issued for property, a reasonably estimated discount may never be taken as an amortized deduction. Yet we still believe that appellant does not possess a valid claim on the amortization issue. In our opinion, the evidence does not show that appellant had issued its bonds under circumstances which would be the equivalent of a "discount", as that word is used in the applicable Treasury Regutions.

This Court has stated before that "in the application of income tax laws the substance and not the form should control." Per Northcott, C. J., in Helvering v. Security Savings & Commercial Bank, 4 Cir., 72 F.2d 874, 876. Hence, in looking at the core of the instant transaction, we are impressed by the fact that not only were all the offered securities easily disposed of, but that, also, the underwriting group realized a handsome profit of $20,000,000 in addition to the retention of a large part of appellant's voting stock. The circumstances surrounding appellant's original issuance of the securities are not typical of the circumstances that might compel a corporation to discount its securities in the effort to secure for them a ready market. As the facts later revealed, the buying public was only too willing to purchase the securities of appellant. Apparently no discount was necessary for the ready marketing of these securities. But even if we were to concede that a discount might have been necessary for ready marketing, the prices which netted great profits for the underwriters could not here be regarded as the true value of appellant's securities on the date of issuance. Without an available public market to act as a guide, it is difficult to see how the securities originally issued could be treated as having a value any greater than the agreed total value of the very assets of Dodge Brothers which these securities represented —that is, a value of $132,000,000.

In income tax accounting, the issuance of bonds at a discount is regarded as an assumption by the issuing corporation of additional interest payments. It therefore becomes incumbent upon us to look to the substance of a given transaction to see whether a discount, in the nature of additional interest, has actually been given by the issuing corporation, thus determining whether such discount comes within the amortization regulation. In New York, Chicago & St. Louis R. R. Co. v. Commissioner, 1931, 23 B.T.A. 177, 196, affirmed in 1933, 62 App.D.C. 29, 64 F.2d 152, the Board of Tax Appeals aptly stated:

"Discount is a variable term, but the meaning which is clearly intended in this connection is, the difference between the face amount of the debt which, it is assumed, will be paid at maturity, and the actual lower amount which is received from the lender at the time of the creation of the debt. Colloquially, it is the difference between the face amount of the bonds and the lower cash sale price. The amortization of this discount imports a theory that the discount is an adjustment of the difference between the interest prescribed and the going market rate for money. It is sometimes metaphorically called deferred interest. To a taxpayer on the cash basis, amortization is not deductible, Chicago & Alton R. R. Co. v. United States, 53 Ct.Cl. 41; Baldwin Locomotive Works v. McCoach [D.C.], 215

F. 967, [Id., 3 Cir.] 221 F. 59, because whether this quasi-interest be treated as if paid at the time of the issuance of the bonds or at the time of their maturity, there is no room for a non-cash deduction at any other time when no actual disbursement takes place. On the accrual basis, the theory being that the discount is quasi-interest on a loan, it is treated as if accruing ratably year by year in enlargement of the actual interest expressed in terms in the bond. It seems plain, therefore, that this amortization is but a concept devised for accounting convenience and is limited by the resemblance to interest. Were the discount regarded as a variation in the amount of the principal of the loan either at the time it was made or at the time of repayment, it may be questioned whether even an accrual system could recognize it at intermediate times. It is only as quasi-interest that its amortization is given deductibility."

Under this limited interpretation of the meaning of "discount", we are not able to sustain the contentions of appellant.

Appellee, in its brief, and the District Judge, in his opinion, both cite New York, Chicago & St. L. R. R. Co. v. Commissioner, supra, and Southern Ry. Co. v. Commissioner, 1933, 27 B.T.A. 673, affirmed in part and reversed in part on other grounds, 4 Cir., 1935, 74 F.2d 887, in support of the broad proposition that when bonds are issued for property no discount is incurred. We do not so interpret these cases; rather, do we find in them support for the less sweeping view we have expressed herein. In the Southern Ry. case, supra, the petitioner had acquired Mobile & Ohio General 4% Bonds, with a par value of $8,356,-000 and a market value of $7,938,200. In exchange for the Mobile & Ohio bonds, the petitioner had conveyed its own bonds of a par value of $8,356,000. Petitioner sought to amortize as a discount the difference between the market value of the acquired bonds and the total par value of the issued bonds. The Board of Tax Appeals denied the existence of a "discount" and cogently stated (27 B.T.A. at page 688):

"The promise to pay a greater sum than the value of the property does not establish ipso facto the presence of discount in the transaction. The holders of the Mobile & Ohio's General 4's [the acquired bonds], having voting control of the Mobile and Ohio, may have driven a hard bargain in the petitioner's attempt to secure that control. In that situation the doctrine of non-deductibility of cost of property until its realization through sale or other disposition would deny the claimed deduction. We see nothing in the stipulated facts to indicate discount."

We believe that the evidence does not establish the existence of a debenture discount in the original transfer of the securities from appellant to the underwriting group.

■ Furthermore, we reject appellant's alternative contention, that a 5% discount should be allowed, inasmuch as this contention is expressly based on an assumption which is in direct contradiction to the stipulated facts. Appellant made no substantial expenditure for expenses incurred, or commissions paid, in the final sale and marketing of the securities. All marketing expenditures were incurred and paid by the underwriting group. The members of this group acted entirely for themselves; in no way, wise or manner did they represent appellant. Under this hypothetical analysis, which is utterly contrary to the actual facts, appellant must necessarily fail.

For the reasons expressed above, the judgments of the District Court are affirmed.

Affirmed.