Clifford M. STRAUSS, Liquidator of F. Strauss & Son, Inc., of Shreveport, in Liquidation

v.

UNITED STATES of America.

Civ. A. No. 7529.

United States District Court
W. D. Louisiana,
Monroe Division.

Dec. 12, 1961.

846

B. Roy Liuzza, Hudson, Potts & Bernstein, Monroe, La., for plaintiff.

T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., for the Government.

BEN C. DAWKINS, Jr., Chief Judge.

This is an action to recover certain tax benefits which would have accrued to plaintiff had the Internal Revenue Service not disallowed deductions claimed by plaintiff.

The facts are not in substantial dispute: For many years prior to 1946, what the parties have referred to as the Schuster partnership operated a wholesale liquor business in Shreveport, Louisiana. The partners were Sam Schuster, Dave Schuster, and Harold Lazarus. In December, 1945, a partnership, known as the Strauss partnership, was formed by Harold Lazarus, Irvin M. Shlenker, Herman Masur, Fred Strauss, and Clifford M. Strauss. The interests of the partners were as follows:

| Harold Lazarus | 1/3 |
| Irvin M. Shlenker | 1/6 |
| Herman Masur | 1/6 |
| Fred Strauss | 1/6 |
| Clifford M. Strauss | 1/6 |

On January 2, 1946, the Strauss partnership purchased the Schuster partnership as a going concern, paying the sum of $147,903.73 for the physical assets of the business, and the sum of $37,500 for "good will." On March 1, 1946, the Strauss partnership was incorporated under the laws of Louisiana and designated F. Strauss & Son, Incorporated. The assets of the Schuster partnership were transferred in toto to the newly formed corporation in exchange for the stock in that corporation. At the time of liquidation of F. Strauss & Son, Incorporated, approximately seven years later, the ownership and relationship between the shareholders were as follows:

| Stockholder | Shares | Per Cent | Relationship |
| --- | --- | --- | --- |
| Harold Lazarus (Lessor) | 990 | 29.11+ | |
| Clifford M. Strauss (Lessor) | 825 | 24.26+ | |
| Irvin M. Shlenker (Lessor) | 600 | 17.64+ | |
| Herman Masur | 600 | 17.64+ | Father-in-law of Irvin Shlenker |
| Hattie K. Strauss | 300 | 8.82+ | Mother of Clifford Strauss |
| Jean S. Mintz | 37½ | 1.10+ | Daughter of Clifford Strauss |
| Peggy Greenbaum | 37½ | 1.10+ | Daughter of Clifford Strauss |
| Louis Lazarus | 10 | .29+ | Son of Harold Lazarus |

In May of 1948, Harold Lazarus, Clifford Strauss, and Irvin M. Shlenker, who together owned two-thirds of the outstanding stock of F. Strauss & Son, Incorporated, purchased a 30,000 square foot tract of land on Marshall Street in

Shreveport, from the Louisiana & Arkansas Railway Company for a price of $18,000.

On July 6, 1948, F. Strauss & Son, Incorporated, entered into a written lease for the rental of this 30,000 square foot tract from Clifford Strauss, Irvin M. Shlenker, and Harold Lazarus. The term of the lease was for fifteen years and the rental price was $1,080 per annum with no provision for an option to renew. Under the terms of the lease, the lessee, F. Strauss & Son, Incorporated, was obligated to construct a building upon the land to handle its liquor, beer, and wine wholesale distributorship. The lessee was obligated to pay all taxes assessed against the property and improvements thereon. Upon termination of the lease, by expiration or otherwise, all improvements were to become the property of the lessors and no assignment or sublease of the premises could be made, in whole or in part, without the written consent of the lessors.

Pursuant to the terms of this lease, F. Strauss & Son, Incorporated, constructed a brick, steel and concrete one-story, warehouse-type building at a cost of $125,625.24, including the cost of air conditioning.

Depreciation of the improvements was to be amortized over the remaining term of the lease, fourteen years and several months, although it was reasonable to assume that the building would have a useful life in excess of that term.

Through April 1, 1956, the Strauss corporation carried on a successful business distributing at wholesale Falstaff beer and Schenley liquor products. Personal conflicts developed, however, between the management of Affiliated Distillers Brands Corporation, the supplier of Schenley products, and Clifford Strauss, and, effective October 31, 1955, the former terminated the supply of whiskey theretofore available to the Strauss corporation. Clifford Strauss testified that, in contrast to the beer-distributorship part of the business, the liquor business constituted approximately seventy-five per cent of the total sales volume, ap-proximately ninety per cent of the total inventory, and approximately one hundred per cent of the total accounts receivable, this being accounted for by the fact that the beer was sold only for cash.

As the consequence of losing the Schenley franchise, the stockholders were forced to liquidate the Strauss corporation. Prior to voting to dissolve, however, the management made unsuccessful attempts to secure a franchise from another national supplier of liquor products.

On March 14, 1956, Harold Lazarus incorporated the Falstaff Distributing Company for the purpose of acquiring and operating the beer business then being conducted by the Strauss corporation. On March 16, 1956, the lessors under the Strauss corporation lease, Harold Lazarus, Clifford M. Strauss, and Irvin M. Shlenker, leased the 30,000 square foot tract to Lazarus' newly organized Falstaff Distributing Company, it being agreed between the parties that the lessee would take possession on or after April 1, 1956, although as of then, the Strauss corporation had seven years remaining on the unexpired term of the original fifteen-year lease. The record does not reveal that the Strauss corporation or its stockholders gave the lessors permission to enter into a new lease during the term of the already existing lease. Objections, however, apparently were not made and the lessors, who were, of course, controlling stockholders in the lessee-corporation, proceeded according to the terms of the new lease agreement.

On April 1, 1956, the lessors and the Strauss corporation mutually agreed to cancel the existing lease on the property with the improvements becoming the property of the lessors under the terms of the lease. The corporation subsequently dissolved, and the cash received for its assets was distributed proportionately to its stockholders. The assets incident to the distribution and sale of Falstaff beer products were sold to the Falstaff Distributing Company, and the balance was sold to third persons.

On its final income tax return for the period beginning March 1, 1956, and end-

ing January 16, 1957, the date of dissolution, the Strauss corporation reported a net operating loss in the amount of $109,322.53. In arriving at this figure, the corporation deducted from its gross income the sum of $37,500, the price paid the Schuster partnership for the good will of the going business. Added to this was the unrecovered or unamortized cost of the improvements to the leased premises, $63,569.60. The net operating loss for the year 1957 was made the basis of a net operating loss carry-back under the provisions of Section 172(b) (1) (A) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 172(b) (1) (A), and the loss was carried back against the income of the corporation reported on its income tax returns for the fiscal years ending February, 1955, and 1956. Accordingly, the Strauss corporation filed claims for refunds of taxes paid for the fiscal year 1955 in the amount of $14,689.80, and for the fiscal year of 1956 in the amount of $20,897.93.

The Internal Revenue Service caused an audit to be made of the Strauss corporation's claims for refunds and its Federal income tax returns. As the result of this audit, the corporation's deductions for good will in the amount of $37,500, and the unamortized cost of the improvements on the leased premises in the amount of $63,359.60, were disallowed and the corporation's claims for refund were administratively rejected. This suit followed.

## Good Will

The cost of good will in connection with acquisition of the assets of a going concern is a capital expenditure. Int.Rev. Regs. Sec. 1.263(a)–2. Here, the undisputed evidence is that the taxpayer purchased the assets of the Schuster partnership, a going concern, in 1946, and that the parties bargained for and received a fixed price in exchange for the inventory, the other physical assets, and the intangibles of that enterprise. The cost to the Strauss partnership of the good will is admitted by the government to have been $37,500 which, until the liquidation of the taxpayer, was carried on its books unchanged in valuation. No deduction for depreciation or obsolescence of good will was made at any time during the existence of the corporate taxpayer, and none would have been allowable. Int.Rev.Regs. Sec. 1.167(a)–3, Dodge Brothers v. United States, 118 F.2d 95 (4 Cir., 1941).

The taxpayer profited during the years of its existence and the government does not dispute the valuation placed upon good will at the time the Schenley franchise was terminated and the assets of the taxpayer were sold or otherwise disposed of through liquidation. The theory of the government's position is that, upon the sale of the assets used for the beer distributorship portion of the taxpayer's business, the $37,500 good will element was transferred or passed on to the Falstaff Distributing Company as a matter of law and that, therefore, the taxpayer sustained no loss of good will.

It is true, of course, that the use of the words "good will" or the equivalent are not necessary in the act of sale if, in fact, what is transferred does give to the purchaser everything which effectively can aid him to step into the shoes of the seller. Estate of F. G. Masquelette v. Commissioner, 239 F.2d 322 (5 Cir., 1956); Cohen v. Kelm, 119 F.Supp. 376 (Minn., 1953). However, in considering the realities of the transaction between the taxpayer and the Falstaff Distributing Company, it is evident that if in fact any measure of good will was transferred at that time, it was substantially less than the amount attributable to the taxpayer's business prior to the loss of the Schenley franchise and the liquidation of the corporation.

On cross examination by government counsel, Clifford Strauss testified as follows:

"Q. Mr. Lazarus, he took over the beer operation of F. Strauss? A. He did not take over. He bought the assets of the F. Strauss & Son, Inc., in Shreveport, the assets consisting of the beer inventory and some of the trucks on which they were distributed.

"The Court: Did he pay anything for the good will?

"The Witness: He did not."

On direct examination, Clifford Strauss testified as follows:

"Q. In Shreveport, what portion of your business do you estimate to be represented by the Schenley lines? A. I don't know what yardstick you use when you say 'represented.' The inventory, I would say, was 90% Schenley merchandise. The accounts receivable were probably 100% Schenley, because the beer was all sold for cash. The personnel would have been at least, I would say, 60 to 70% used for the liquor distributing business, which is Schenley.

"Q. How about the sales volume? A. Oh, I would say the liquor represented about 75%.

"Q. Did you, as a stockholder of the corporation, feel that this corporation could profitably continue without this Schenley line? A. No. I was certain that it could not—that or some other national line.

"Q. As liquidator of the corporation, what did you do with the assets, sir? A. I reduced them to cash by selling the assets and distributing it to the stockholders.

"Q. Did you sell some of the assets to the Falstaff Distributing Company? A. I did. I sold the beer inventory and some of the trucks and office furniture, and such as that."

Harold Lazarus testified on direct examination that the taxpayer paid $37,500 for the good will of the Schuster partnership and that the asset was accordingly carried on the taxpayer's books as such, remaining unchanged until liquidation of the taxpayer. He further testified:

"Q. Why did you vote to dissolve the corporation, sir? A. Because the corporation was operating at a loss. We had lost the Schenley franchise, which was the main revenue to our business at that time.

"Q. Did you have any control over the loss of this Schenley franchise? A. No, sir.

"Q. Do you know whether there were any efforts made to get a new whiskey line? A. Yes, sir, I do. Strenuous efforts were made.

"Q. With what results? A. We couldn't get one.

"Q. As a director of the corporation and stockholder of the corporation, did you feel the corporation could operate at a profit without the Schenley line? A. I did not.

"Q. The corporation was also a distributor of Falstaff beer, was it not? A. Yes, sir.

"Q. What portion of the Strauss corporation's business would you estimate to be represented by the Falstaff beer distributorship? A. I don't have the figures in front of me.

"The Court: Roughly?

"The Witness: Oh, I would imagine at that time it was in the neighborhood of a third. Something like that.

"Q. When the corporation appointed Mr. Strauss liquidator we have agreed he proceeded to reduce the assets to cash so that he could make a distribution. Did your Falstaff corporation purchase any of the assets of this corporation? A. Yes.

"Q. Which assets did they purchase? A. They purchased the physical assets and the beer.

"Q. You mean beer inventory? A. Beer inventory, yes, sir.

"Q. How was the price fixed for those assets? A. The book value on the permanent assets—trucks, fixtures, machinery, equipment, and cost of the beer.

"Q. Did you pay any price for the good will to the Strauss corporation? A. No.

"Q. Did you bargain for any good will of the Strauss corporation? A. No.

"Q. Did you consider you were taking into the Falstaff Distributing Company any of the good will of the Strauss corporation? A. No."

J. S. Garelick, certified public accountant retained by the taxpayer at the time the assets of the Schuster partnership were acquired, testified that the sum of $37,500 was entered onto the taxpayer's books as good will and was simply a matter of proper accounting treatment.

The foregoing testimony and the fact that the taxpayer did not transfer the whole or even the bulk of its business assets to the Falstaff Distributing Company suggests that something less than the total good will passed as a matter of law, namely, only the good will incident to the beer distributorship and not that incident to the liquor and wine phases of the business. This conclusion is entirely consistent with the reasoning of the District Court in Metropolitan Laundry Co. v. United States, 100 F.Supp. 803, 806 (N.D., Calif., 1951), where it was held:

"It may be granted that good will cannot exist in the abstract, apart from a going business, and that, generally speaking, the good will of a business cannot be entirely disposed of or destroyed while the business continues. But certainly a going concern can dispose of its business in a particular area or in respect to a particular product or service along with the incident good will without abandoning its entire business. * * *"

In other words, it is not necessary that the total good will of a business be lost or destroyed upon the sale or dissolution of a part of that business and it is logical to assume that good will, in some instances, is attached in varying amounts to different functions or departments of the total enterprise. See, also, Grace Bros. v. Commissioner, 9 Cir., 173 F.2d 170 (1949).

It would be incompatible with the facts for this Court to conclude that the taxpayer, by transferring the assets incident to the beer phase of the business to the Falstaff Distributing Company, necessarily sold either *all* or *none* of its good will. Rather, the realities of the transaction support the conclusion that a relatively small portion of the good will passed as a matter of law with the sale of those assets to the Falstaff Distributing Company.

Therefore, the balance of the good will either remained with the taxpayer or was lost or destroyed prior to or upon liquidation. The evidence clearly established that the Schenley franchise was terminated effective October 31, 1955, and thereafter taxpayer's supply of whiskey was cut off with no other national brand distributorship franchise obtainable. There can be no real doubt that the good will incident to the whiskey distributorship suffered more than a mere diminution in value. The possibility which then existed, that some day the taxpayer might be in a position to re-establish the whiskey distributorship, and that the psychological ties built up through the taxpayer's existence might induce some of the taxpayer's former customers to renew their patronage, does not negative the conclusion that in 1956 the good will value of the taxpayer's whiskey distributorship was wholly lost.

On the basis of the testimony of Clifford Strauss and Harold Lazarus relative to the percentage of the total business activity devoted to and resulting from the beer distributorship, we believe a fair and equitable result will be reached by concluding that twenty-five per cent of the total good will was transferred as a matter of law to the Falstaff Distributing Company, with the balance remaining in the hands of the taxpayer. Thus, upon being forced to abandon the whiskey distributorship, the taxpayer sustained a loss in good will in the amount of $28,125 for which a deduction should have been allowed.

Contrary to the government's position, the limitation on capital losses imposed by 26 U.S.C.A. § 1211 applies only in a case where the loss to the corporation results from "sales or exchanges of capital assets." Here the loss was occasioned

by the taxpayer's abandonment and subsequent liquidation of the whiskey distributorship due to the unilateral termination of its Schenley franchise, and, therefore, the tax result is governed by the provisions of 26 U.S.C.A. § 165 et seq., which provides that there shall be allowed as a deduction any loss sustained during the taxable year not compensated for by insurance or otherwise. The taxpayer's good will which was lost or destroyed in 1956 was attached and was incident to the Schenley franchise and the valuable business relationships existing solely because of the taxpayer's function as a distributor for whiskey products. Without this supply of National Brand whiskey, this segment of the taxpayer's enterprise was worthless as a profitable, going concern. The patronage which it had enjoyed because it was a whiskey distributorship was totally lost when Schenley cut off its supply of products and its business was therefore abandoned. See Metropolitan Laundry Co. v. United States, supra.

In Revenue Ruling 1957–503, it was held that where a corporation abandoned a business during a taxable year and, in the same year, abandoned all the assets of the business, including purchased good will, the corporation's basis in good will was deductible as an ordinary loss in arriving at taxable income for that year. The facts here clearly are within the rule announced in that Ruling and, therefore, we hold that the taxpayer is entitled to a deduction of $28,125 as an ordinary loss sustained in the fiscal year ending January 16, 1957.

Leasehold Improvements

■ The cost to a lessee of erecting buildings or making other permanent improvements on leased property is a capital expenditure and is recoverable through allowances for depreciation or amortization. If the estimated useful life of such property, determined without regard to the terms of the lease, would be longer than the remaining period of such lease, the allowances shall take the form of annual deductions from gross income in an amount equal to the unrecovered cost of such capital expenditures divided by the number of years remaining in the term of the lease. Int.Rev.Regs. Sec. 1.167(a)–4. See Duffy v. Central Railroad Co. of New Jersey, 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846 (1925); Charles C. Lewis Co. v. United States, D.C., 14 F.Supp. 471 (Mass., 1936); Cogar v. Commissioner, 44 F.2d 554 (6 Cir., 1930). Where a lease is terminated prior to full expiration by its own terms, the basis for further amortization of such expenditures is destroyed and consequently any unamortized portion then remaining must be charged off at once. Cassatt v. Commissioner, 137 F.2d 745 (3 Cir., 1943). See Mertens, Law of Federal Income Taxation, Sec. 12.37.

■ Where, however, an income-producing asset is distributed to shareholders upon liquidation, the rule is that no deduction for the loss of the unamortized balance of the cost of such asset may be taken by the liquidating corporation. Wolan v. Commissioner, 184 F.2d 101 (10 Cir., 1950). This rule applies also to a distribution of the lease itself to the stockholders. See Tom L. Burnett Cattle Co., T.C.Memo. 1950–15, 58th St. Plaza Theater v. Commissioner, 195 F. 2d 724 (2 Cir., 1952), cert. den. 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638; Cooper Foundation v. O'Malley, 221 F.2d 279 (8 Cir., 1955).

■ A lease of land for a definite term by some of the stockholders, as lessors, to the corporation, as lessee, with a provision that all improvements shall become the property of the lessor-stockholders upon expiration or termination of the lease, is not objectionable, for tax purposes, merely because of the close relationship existing between the parties. This is true even though the lessor-stockholders and the other corporate stockholders are also related by blood or affinity. Bernard Goldstein, et al., T.C.Memo. 1957–218; Fort Wharf Ice Company v. Commissioner, 23 T.C. 202. This is not to say, however, that other circumstances attending the transaction will not render the net effect of the transaction objec-

tionable for tax purposes. The cited authorities distinguish between an effective distribution of a corporate asset to the stockholders on the one hand, and a forfeiture of the leasehold improvements to the lessor-stockholders in a *bona fide* business transaction prescribed by the terms of the lease on the other. The inquiry is whether, due to the relationship between the lessors and the other corporate stockholders, the net effect of the transaction is to distribute corporate assets to stockholders or to effect a *bona fide* cancellation of the lease whereunder the improvements become the property of the lessors.

In determining the net effect of the transaction between the related taxpayers, courts have looked to whether proportionate benefits were received by the stockholders; whether the transaction was obviously not in the best business interest of the corporation; whether the lease was for a fixed period; whether the amortization was reasonable; whether the rental price was realistic and reasonable; and whether the same arrangement might have occurred between strangers—a result ordinarily to be discerned by the unreasonableness on one side or the other of the transaction under scrutiny.

Here, the lease of the 30,000 square foot tract of land was for a definite term, fifteen years, with on option to renew upon expiration. Under the terms of the lease, the taxpayer was obligated to construct a building to house the wholesale liquor, wine, and beer distributorship. No provisions were made, however, for the cost of the improvements, nor were building specifications agreed upon by the parties. Upon termination of the lease, by expiration of its term or otherwise, all improvements were to become the property of the lessors. The lease further provided that the lessee-corporation would pay all taxes assessed against the property and improvements and that no assignment or sublease could be made in whole or in part, without the written consent of the lessors. The yearly rental price was $1,080.

As noted, the taxpayer constructed a brick, steel and concrete one-story, warehouse-type building with air conditioning at a total cost of $125,625.24. The cost of these improvements was scheduled to be amortized over the remaining term of the lease and appropriate pro rata deductions were made and allowed by the Commissioner for six years. The government has not proven the terms of the lease unreasonable or that the same arrangement might not have been made between strangers. Garelick testified that, since the improvements could be depreciated over the fifteen-year term of the lease, and the land rental received by the stockholders was only $1,080.00 per annum, the taxpayer would benefit over whatever other arrangements could be made with outside lessors. Garelick further testified that the fair rental value of the 30,000 square foot tract with the improvements made thereon by the taxpayer was approximately one per cent of the cost of the land and of the building per month, or about $16,000 per annum. Clearly in the interest of the taxpayer-corporation, this transaction was not unfavorable because, had it leased comparable property from an outside lessor at an annual rental of $16,000, the rental for the fifteen-year term would have amounted to $240,000, and the taxpayer would also have given up possession of the property at the end of the term. Under the lease, however, the land rental would have amounted to $16,200 over the fifteen-year term and the cost of the improvements, $125,625.24, would have been amortized with annual deductions over the term so as to recover the cost during that period. This would have resulted in a considerable economic saving to the taxpayer-corporation.

This agreement is contrasted with the provisions in 58th St. Plaza Theater v. Commissioner, supra, wherein the taxpayer-corporation leased properties to one of its stockholders under conditions which severely limited the corporation's earnings. There the Court held that the lease served no business purpose for the corporation but was actually a family

arrangement to give the stockholder increased income without payment of taxes thereon by the corporation. The transaction was aptly termed "bad business" for the corporation and disregarded *for tax purposes*. The lease between the taxpayer-corporation and its stockholders here is more favorable to the corporation by its terms and, therefore, the government's theory that the corporate assets were distributed to stockholders under the lease arrangement is not applicable.

Thus, as of the time this lease was executed, it has not been shown to have fallen within the exception to the general rule that a lease of land for a definite term by some of the stockholders to the corporation with a provision that all improvements shall become the property of the lessor-stockholders upon expiration or termination of the lease is not objectionable, for tax purposes, merely because of the close relationship existing between the parties, and even though the parties are related by blood or affinity.

The government argues that, to allow the taxpayer to deduct the unamortized portion of the capital expenditures existing at the time the lease was cancelled, would be to engage in a mockery of our tax laws; that the termination of the lease was devoid of substance or of any *bona fide* business purpose; and that the taxpayer should have obtained the lessors' consent to sublet the premises which, according to the testimony, had a rental value of $16,000 per annum.

The government offered no evidence, however, to show that, had the lessors and lessees been strangers one to the other, they probably would have reached a different result. Indeed, it is only reasonable to believe that any business, upon losing a franchise that supported 75% of its entire sales volume, would terminate its existing leases and consider dissolution and liquidation of its remaining business assets. It is not for this Court to announce a rule that would require this taxpayer, in order to realize the deduction it is claiming here, to continue its corporate existence simply for the purpose of subleasing its already leased premises and continue to operate at a 25% capacity level. Our conclusion as to the corporation's *bona fides* is strengthened by the fact that its management made unsuccessful attempts to obtain another national whiskey franchise. It would be unreasonable to conclude, therefore, that the parties to this transaction schemed from the very beginning to evade the ordinary tax consequences flowing from the successful operation of a whiskey, wine, and beer distributorship. The theory of the government's position is inconsistent with the undisputed facts developed at the trial.

It is crystal clear from the evidence that the Schenley franchise was cancelled because of personal ill-feeling between the supplier and taxpayer and that the taxpayer's supply of whiskey products was cut off effective ninety days after notice thereof. The government neither has alleged nor proved that there was any collusion or agreement to cancel the franchise and thereby effect a tax avoidance. Moreover, the net effect of the transaction herein questioned is not shown to have been within the rule announced in Tom L. Burnett Cattle Co., T. C. Memo. 1960–15, citing Wolan v. Commissioner, 184 F.2d 101 (10 Cir., 1950), 58th St. Plaza Theater v. Commissioner, 195 F.2d 724 (2 Cir., 1952) cert. den. 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638, and Cooper Foundation v. O'Malley, 221 F.2d 279, 281 (8 Cir., 1955).

In Cooper Foundation, supra, a twenty-five-year lease agreement between two corporations, one of which acquired all of the outstanding stock of the other within five months of the execution date of the lease, was cancelled and the lessee-corporation was dissolved and its assets liquidated. The lessee sought to deduct as a loss a premium in the sum of $117,-458.35 which had been paid in excess of the annual rental price. The District Court concluded that the lease, was, in effect, distributed to the stockholder-corporation and that the premium was a transfer of a capital asset from one corporation to the other which produced the legal effect of continuing the lease's the-

oretical life and was, therefore, not a loss deductible from gross income. The Eighth Circuit commented: "This was at least a permissible factual conclusion and as such should not be disturbed." The Court also observed that the trial Court regarded the transaction as a possible sham devised to evade taxes. Unlike the facts in Cooper Foundation, supra, the taxpayer here was not wholly owned by its lessors and the lease cancellation was motivated by the loss of its supply franchise which supported approximately 75% of its entire sales volume. Additionally, in Cooper Foundation a 25-year lease was cancelled five months following its execution whereas here the taxpayer cancelled the fifteen-year lease only upon being forced to do so and after the expiration of eight years of the original term. The facts of this case are distinguishable and do not, therefore, fall within the rule discussed above.

The facts in 58th St. Plaza Theater v. Commissioner, supra, also are distinguishable from those here, as discussed earlier in this opinion. In Wolan v. Commissioner, supra, the lessee-corporation's capital stock was acquired by the lessor and, upon liquidation of the former, the latter received all of the capital assets in distribution, including the leasehold estate. The Tenth Circuit reasoned that, upon liquidation of the lessee-corporation, the lessor acquired all of the leasehold rights possessed by its lessee, including the right to continue annual deductions for capital expenditures for the balance of the original lease term. Thus, recovery for the expenditures through annual deductions amortized over the life of the lease was allowed.

In Tom L. Burnett Cattle Co., supra, the taxpayer-corporation leased land from its sole stockholder under terms requiring capital expenditures to be made during the existence of the lease. The corporation was dissolved and the capital assets distributed to the lessor-sole-stockholder. No reason was given in the Court's opinion for the dissolution. The Court held that the net effect of the liquidation was to distribute the lease and all capital assets pertaining to it to the sole stockholder and lessor. Thus, the result was similar to that found in Wolan v. Commissioner, supra, and the Court stated that, although factually different, the case was indistinguishable in principle from and was controlled by the Wolan, Cooper Foundation, and 58th Street Theater cases, supra.

Leases such as the one here have been given judicial approval over objections that the intimate relationships between the lessors and lessees rendered them objectionable *for tax purposes*. See Bernard Goldstein, et al., T.C.Memo. 1957-218, and Fort Wharf Ice Company v. Commissioner, 23 T.C. 202, where lease agreements between related parties requiring capital improvements to be undertaken by the lessees were approved, and annual deductions amortized over the term of the lease, rather than the expected useful life of the improvements, were allowed.

It is not unusual for leases of this kind to prescribe the manner in which legal relations will be altered between the parties in the event the lease is prematurely terminated or the premises are surrendered prior to expiration of the term of the lease. The element of risk involved on the part of the lessee, namely, that the premises will not be needed for the whole term, is compensated for and reflected in the rental price and other obligations prescribed in the agreement. When conditions occur which render these provisions operative, it is very likely that one party to the agreement will benefit more than the other. This is precisely what happened in this case when the taxpayer's Schenley franchise was unilaterally cancelled. Which is to say, the risk that the taxpayer would no longer require the leased premises for the operation of its wholesale distributorship materialized, thereby requiring the taxpayer's stockholders to vote to dissolve the corporation and consequently cancel the lease. The provisions for termination became operative and the lessors regained possession of the premises with all improvements, which they reported

as capital gain for tax purposes. The lease provisions themselves were not objectionable *for tax purposes* although they specifically provided for this contingency.

Therefore, can it be said that simply because these conditions did occur, due to causes beyond the control of the taxpayer, and since the lessors and lessees are related, the general rules will not apply and the unrecovered cost of the improvements will not be deductible as a loss? We think not.

The government has failed in its attempt to overcome plaintiff's position which falls within the general rule discussed earlier in this opinion. Judgment will be granted, therefore, allowing plaintiff to deduct the sum of $63,569.60 from its gross income for the unamortized portion of the capital expenditures on the leasehold, and also to deduct the sum of $28,125.00 for the loss of good will in 1957. The attorneys will calculate the tax results flowing from this ruling.

A proper decree should be presented on notice.