ACTION DISTRIBUTING COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Action Distributing Co. v. Commissioner
Docket No. 2883-82.
United States Tax Court
T.C. Memo 1987-377; 1987 Tax Ct. Memo LEXIS 377; 53 T.C.M. (CCH) 1490; T.C.M. (RIA) 87377; July 30, 1987. Edward M. Deron, Dennis F. Tomorsky, and Steven G. Howell, for the petitioner. Patrick J. Gray, Jr., for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in the Federal income tax of United Beverage Wholesalers, Inc., (hereinafter referred to *379 as United) as follows: Year
Deficiency
1973
$ 25,477.00
1974
69,711.00
1976
63,894.48
1977 (Short Year
11,407.20
1/01/77 to 7/15/77)
Respondent also determined that petitioner, as transferee of United's assets, was liable for the deficiencies in United's Federal income tax in each of the years in issue. The issue for decision is whether United is entitled to deduct the unamortized balance of its costs of leasehold improvements upon the early termination of its leases when the terminations occurred in the course of United's plan of complete liquidation and United's sole shareholder was also the sole lessor in all but one of those leases. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, as orally corrected at trial, and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Action Distributing Company, Inc., is a Michigan corporation. At the time its petition was filed in this case, petitioner's principal business office was located in Livonia, Michigan. Petitioner is a transferee of United's assets within the meaning of section 6901 [1] and, as *380 such, is liable for deficiencies, if any, in United's Federal income tax for its taxable years 1973, 1974, 1976, and its short taxable year ended July 15, 1977. At all times pertinent to this case, United was a Michigan corporation with its principal place of business located in Detroit, Michigan. United reported its income using the accrual method of accounting and on the calendar year basis. During the years in issue United filed its U.S. Corporation Income Tax Returns (Forms 1120) with the Internal Revenue Service Center at Cincinnati, Ohio. At all times relevant prior to July 15, 1977, Robert F. Byrne was the sole shareholder, chairman of the board, and president of United. Prior to his involvement with United, Mr. Byrne was a divisional sales manager for Anheuser-Busch, Inc. He worked for Anheuser-Busch for approximately 15 years. For a brief period of about eleven months between his resignation from Anheuser-Busch and his involvement *381 with United, Mr. Byrne worked as sales manager for Walker Outdoor Advertising. United was organized by Mr. Byrne in 1962 for the purpose of acquiring a Budweiser wholesale beer distributorship from Anheuser-Busch, Inc., for a portion of Wayne County, Michigan, primarily consisting of the city of Detroit. At the time of its acquisition, this partnership distributorship had a market share of about nine percent and was losing about $ 250,000 a year. Some 15 years later, the distributorship had a market share of about 28 percent and was outselling other national brands, namely, Schlitz and Miller. After purchasing the Budweiser distributorship, United had virtually no capital and a large amount of liabilities. As a result, Mr. Byrne initially performed many duties for United. He worked as a salesman, drove a delivery truck around Detroit, worked in the warehouse, and made overnight trips to St. Louis in tractor trailers. United's business was his principal undertaking, and Mr. Byrne devoted as much as seven days a week and as many as 18 hours a day to the business. United initially operated its Budweiser distributorship from a site on Rotunda Drive. In approximately 1963, *382 United moved its operations to some pre-World War II wooden buildings located on Russell Street in Detroit. In or about 1970 a fire devastated the Russell Street facility destroying United's warehouse, inventory, coolers, forklifts, and most of its delivery trucks, none of which were insured. In searching for new warehouse facilities, Mr. Byrne looked at rental properties and also looked at properties available for purchase. United needed a warehouse capable of storing large quantities of inventory and a large parking area for its delivery trucks in a good location reasonably safe from vandalism. Mr. Byrne was unable to find rental property that met all of United's needs. However, of all the properties he examined, a waterfront warehouse for sale on Adair Street appeared more desirable than the others. Like all the other properties, the Adair property required certain modifications to accommodate the particular needs of United. On January 15, 1970, Mr. Byrne, acting in his individual capacity, entered into a land contract with the Ajax Forging and Casting Company for the purchase of the waterfront warehouse on Adair Street (hereinafter referred to as building seven). The *383 contract provided for a total purchase price of $ 270,000 with a cash down payment of $ 50,000. On or about February 1, 1970, United leased building seven from Mr. Byrne for a five-year term ending January 31, 1975. The lease provided rental payments of $ 4,000 a month and required United to pay all real estate property taxes, repairs, maintenance, and insurance. On April 30, 1970, for the stated consideration of $ 25,000, Mr. Byrne executed a Purchaser's Partial Assignment of Land Contract assigning to his ex-wife Margaret O. Byrne, [2] an undivided one-quarter interest in the Ajax Forging and Casting Company land contract pertaining to building seven. On this same date, Mr. Byrne also assigned to his former wife an undivided one-quarter of all his right, title, and interest as landlord in the lease with United for building seven. The assignment of the one-quarter interest in the land contract was subsequently formalized by a quitclaim deed for an undivided one-quarter interest in building seven from Robert F. Byrne to Margaret O. Byrne dated August 16, 1975. The stated consideration for this transfer was $ 75,000. On November 12, 1971, Mr. Byrne, acting in his individual *384 capacity, purchased from the Riley Stoker Corporation the premises adjacent to building seven, identified as buildings one through six, eight, and nine. On or about December 29, 1971, Mr. Byrne, as lessor, and Brewers Leasing Co. (hereinafter referred to as Brewers), as lessee, entered into a lease agreement for building five at $ 2,000 a month for the five-year period from January 1, 1972 through December 31, 1976. Brewers was a Michigan corporation incorporated in 1963. Mr. Byrne owned all of the issued and outstanding stock of Brewers. In 1972 Mr. Byrne transferred all of his stock in Brewers to United, after which United subsequently liquidated Brewers in a section 332 liquidation and United became the successor tenant of building five. Also, on December 29, 1971, Mr. Byrne, as lessor, and United, as lessee, entered into a lease agreement for buildings four and six at $ 3,000 a month for the five-year period from January 1, 1972 through December 31, 1976. On December 23, 1973, United leased buildings one, two, and three from Mr. Byrne at $ 2,750 a month for the five-year period from January 1, 1974 through December 31, 1978. United needed this space to accommodate its *385 expansion into the wine business. Upon the expiration of United's initial lease for building seven, United entered into a new five-year lease for building seven commencing on February 1, 1975 through January 31, 1980 at the rental rate of $ 6,300 per month. On April 1, 1975, Mr. Byrne established a Clifford-type trust for the benefit of his daughter, Kathleen M. Byrne, who was then approximately 17 years of age. Mr. Byrne is both the trustee and the grantor of this trust. On April 1, 1975, Mr. Byrne transferred a one-quarter interest in building seven to himself as trustee, or any successor trustee of the Kathleen M. Byrne rust, by means of a quitclaim deed for the stated consideration of $ 75,000. On May 30, 1975, United acquired a Pabst wholesale beer distributorship for the Kalamazoo, Michigan area. At some previous point, United had acquired a Pabst wholesale beer distributorship for the Hillsdale, Michigan area. On April 2, 1976, United purchased an Altes/Colt 45 wholesale beer distributorship for the city of Detroit to bolster sales revenue and to add a popular malt liquor to United's line of products. United operated the Altes/Colt 45 distributorship from buildings *386 one, two, and three that it had previously leased from Mr. Byrne for its wine business. Anthony Demas, an employee of United, was put in charge of this new distributorship and relieved of his duties as sales manager for the Budweiser distributorships. Mr. Byrne promised Mr. Demas the right of first refusal to buy the Altes/Colt 45 distributorship should United ever decide to sell. All the lease agreements entered into or assumed by United as tenant for buildings one through seven (except for the lease on building seven that expired on January 31, 1975) contained the following provision in paragraph 12 thereof: All additions and improvements made by either party shall belong to the Landlord, provided, however, that all machinery and/or equipment installed in the demised premises at the Tenant's expense, shall remain the property of the Tenant and may be removed by the Tenant. The Tenant shall, however, repair any damages caused directly by said removal. United, as tenant under leases for buildings five and seven, made leasehold improvements to those buildings over a period commencing in 1970 and ending in 1974 totaling $ 35,584 and $ 237,100, respectively. In addition, as *387 tenant under leases for buildings one, two, and three, United made leasehold improvements to these buildings over a period commencing in 1972 and ending in 1977 totaling $ 215,225. The combined total of all leasehold improvements made by United during the course of its leases for buildings one through seven amounted to $ 487,909. United claimed depreciation allowances using the straight-line method over the useful lives of the various improvements. During the mid-1970's, several events occurred that had a direct impact on United's business and influenced its decision to liquidate. The city of Detroit had been experiencing a continual population decline, causing United to lose a number of its accounts. In addition, Detroit's economy had become stagnant, and United had become a frequent victim of crime-related activities that seemed to increase as unemployment increased. There was also a new Michigan state bottle and can deposit law scheduled for a vote on November 2, 1976, which was projected to adversely affect United's business. [3] Moreover, in April or May 1976, Anheuser-Busch, Inc., experienced a strike which lasted approximately three or four months and caused a deterioration *388 in United's Budweiser distributorship. Furthermore, United had been experiencing increased competition in the marketplace from the Miller Brewing Company. The introduction of Miller Lite and seven-ounce bottles, together with an aggressive Miller advertising campaign, caused United to lose a lot of its Budweiser beer business. [4] Due to these various events and on the advice of United's certified public accountants and attorneys, United adopted a section 337 plan of complete liquidation. [5]
United adopted its plan of liquidation on July 19, 1976. As of that date and at all times relevant prior thereto, United operated four different wholesale beer distributorships: its Budweiser and Altes/Colt 45 distributorships *389 in the Detroit area and its two Pabst distributorships in the Kalamazoo and Hillsdale, Michigan area. At the time United adopted its plan of liquidation, United was operating its Budweiser and Altes/Colt 45 distributorships from buildings one through seven under the following leases: (a) For buildings one, two, and three, a five-year lease with a term that commenced January 1, 1974 and ended December 31, 1978, at an annual rate of $ 33,000 ($ 2,750 per month); (b) For buildings four and six, a five-year lease with a term that commenced January 1, 1972 and ended December 31, 1976, at an annual rate of $ 36,000 ($ 3,000 per month); (c) For building five, a five-year lease with a term that commenced January 1, 1972 and ended December 31, 1976, at an annual rate of $ 24,000 ($ 2,000 per month); [6]
(d) For building seven, a five-year lease with a term that commenced February 1, 1975 and ended January 31, 1980, at an annual rate of $ 75,600 ($ 6,300) per month). Paragraph 6 of each of the above leases provided as follows: That *390 he [the tenant] will not assign this Lease nor sublet the premises nor any part thereof without the consent of the Landlord thereto endorsed hereon in writing. Moreover, not one of the above leases gave United the option to renew exclusive of the standard month-to-month holdover provision set forth in paragraph 8 of each lease. However, United would have continued to lease these buildings after the expiration of its leases had it not sold its Budweiser and Altes/Colt 45 wholesale beer distributorships. On or about September 16, 1976, Margaret O. Byrne, for reasons not relevant to or determinative of the issues herein, [7] was substituted for Mr. Byrne as the named lessor on all four of the above-mentioned leases with United with respect to buildings one through seven. However, at all times relevant Mr. Byrne was the 100 percent owner and lessor of buildings one through six and a 50 percent owner and lessor of building seven; Margaret O. Byrne was a 25 percent owner and lessor of building seven; and Mr. Byrne as trustee of the Kathleen M. Byrne Trust was a 25 percent owner and lessor of building seven. *391 On July 21, 1976, two days after United adopted its plan of liquidation, the Wolpin Company, Inc., (hereinafter referred to as Wolpin) entered into an agreement (hereinafter referred to as the Wolpin Sales Agreement) with United to acquire United's Budweiser wholesale beer distributorship. [8]Wolpin's ability to lease buildings five, six, and seven, for which United held leases, was a very necessary and integral part of the negotiations with respect to Wolpin's acquiring the Budweiser distributorships. Indeed, Paragraph F of the Wolpin Sales Agreement dated July 21, 1976, specifically provided that Wolpin would lease buildings five, six, and seven, together with all the improvements thereon, in the event of the closing of the purchase and sale of the Budweiser distributorship. *392 The Wolpin Sales Agreement was amended by an Amendment to Agreement dated September 17, 1976. This amendment acknowledged the substitution of Margaret O. Byrne for Mr. Byrne as lessor on United's leases covering buildings five, six, and seven. It also provided that prior to the closing of the sales transaction, Mr. Byrne was required to terminate or cause to be terminated any and all existing leases covering buildings five, six, and seven with United as tenant. Upon closing, Wolpin agreed to lease from Margaret O. Byrne buildings five, six, and seven, together with all improvements thereon. On October 15, 1976, United and Wolpin closed on the purchase and sale of the Budweiser distributorship; United and Margaret O. Byrne executed a document entitled "Termination of Leases By Mutual Agreement," [9] effectively terminating United's leases covering buildings four through seven; and Wolpin entered into a new lease with Margaret O. Byrne for buildings five, six, and seven. This lease agreement provided for an initial term of five years plus two consecutive options to extend the term of five years plus two consecutive options to extend the term of five years each at an annual rent *393 of $ 150,000 ($ 12,500 per month). Paragraph (40) of this lease provided as follows: Upon the expiration of the term of this Lease, Tenant shall surrender the premises without removing any of the permanent improvements to the premises which existed at the time the Tenant took possession, which such permanent improvements shall thereupon be deemed the property of the Landlord. After October 15, 1976, the effective date of the Termination of Leases by Mutual Agreement and the date Wolpin took possession of buildings five, six, and seven pursuant to its new lease with Margaret O. Byrne, United has not had possession of nor has it used any of the leasehold improvements which it had made to the leased premises while it was the tenant thereof. [10]
*394 At a special meeting of United's board of directors held on December 13, 1976, a resolution was passed authorizing the sale of the Altes/Colt 45 wholesale beer distributorship to Anthony Demas. The terms of the proposed sale required a down payment of $ 150,000, representing payment for the equipment, and $ 100,000 on a five-year note, representing payment for goodwill and cash for the inventory at the time of closing. In addition, the sale was conditioned on Anthony Demas' entering into a five-year net-net lease for buildings one, two, and three, which were at that time leased by United. At some point in 1977 after the sale of the Altes/Colt 45 distributorship had been negotiated with Anthony Demas, but prior to closing on April 1, 1977, United made leasehold improvements with respect to buildings one, two, and three. Underground storage tanks were installed at a cost of $ 7,926 and United spent $ 7,950 on the buildings' heating system. United paid for these improvements in March and April of 1977, respectively. On April 1, 1977, Demas Distributors, Inc., (hereinafter referred to as Demas) executed an agreement with United for the purchase of United's Altes/Colt 45 wholesale *395 beer distributorship. Moreover, on April 1, 1977, Demas entered into a lease with Margaret O. Byrne for buildings one, two, and three for a term of five years at an annual rent of $ 42,000 ($ 3,500 per month). Paragraph (38) of this lease provided as follows: Upon the expiration of the term of this lease, Tenant shall surrender the premises without removing any of the permanent improvements to the premises which existed at the time that Tenant took possession, which such permanent improvements shall thereupon be deemed the property of the Landlord. Since Demas took possession of buildings, one, two, and three under its April 1, 1977 lease with Margaret O. Byrne, United has not had possession of nor has it used any of the leasehold improvements it had made with respect to the leased premises while it was a tenant thereof. On July 15, 1977, petitioner Action Distributing Company purchased all of the issued and outstanding stock of United from United's sole shareholder, Mr. Byrne, pursuant to an agreement dated July 14, 1977. [11] Also on July 15, 1977, United was liquidated pursuant to the plan of liquidation it adopted on July 19, 1976. United's remaining assets, including *396 its two Pabst wholesale beer distributorships for the Kalamazoo and Hillsdale, Michigan areas were distributed to Action Distributing Company in liquidation. At no time did United, Mr. Byrne, Margaret O. Byrne, or Mr. Byrne as trustee of the Kathleen M. Byrne Trust own any shares of stock in either Wolpin, Demas, or Action Distributing Company. On Form 4797 (Supplemental Schedule of Gains and Losses) attached to its U.S. Corporation Income Tax Return (Form 1120) for its taxable year 1976, United reported a loss totaling $ 184,992 for the undepreciated (unamortized) balance of its costs of leasehold improvements that remained after United terminated its leases with respect to buildings five and seven. Of this amount, $ 157,698 was attributable to building five and $ 27,294 was attributable to building seven. This $ 184,992 loss was in *397 addition to the annual amortization (depreciation) United claimed with respect to those leasehold improvements which respondent allowed. On Form 4797 (Supplemental Schedule of Gains and Losses) attached to its final U.S. Corporation Income Tax Return (Form 1120) for its short taxable year ended July 15, 1977, United reported a loss totaling $ 168,996 for the undepreciated (unamortized) balance of its costs of improvements that remained after United terminated its lease with respect to buildings one, two, and three. This loss was in addition to the annual amortization (depreciation) United claimed with respect to those leasehold improvements which respondent allowed. On or about August 16, 1977, petitioner timely filed an Application for Tentative Carryback Adjustment (Form 1139) on behalf of and as transferee of the assets of United carrying back to United's 1973 taxable year the net operting loss of $ 30,666 and unused investment credit of $ 10,758 reported on United's 1976 corporate tax return. These adjustments resulted in a tax decrease in such year in the amount of $ 25,477 which respondent allowed to the extent of $ 24,901. [12] On or about January 19, 1978, petitioner *398 timely filed an Application for Tentative Carryback Adjustment (Form 1139) on behalf of and as transferee of the assets of United, carrying back to United's 1974 taxable year the next operating loss of $ 145,231 reported on United's corporate tax return for its short taxable year ended July 15, 1977. This adjustment resulted in a tax decrease in such year in the amount of $ 69,711 which respondent fully allowed. By notice of liability dated November 12, 1981, respondent determined that petitioner, as transferee of the assets of United, was liable for the deficiencies, if any, in United's Federal income tax. [13] Respondent disallowed the ordinary losses of $ 184,992 and $ 168,996 United claimed for its 1976 taxable year and its short taxable year ended July 15, 1977, respectively, since the leasehold improvements were in substance distributed to Mr. Byrne, United's sole stockholder. In the alternative, respondent disallowed the losses because the losses claimed represent the adjusted basis of assets sold or exchanged in connection with a section 337 liquidation. *399 [14]
*400 OPINION Generally, costs incurred by a lessee for leasehold improvements are required to be recovered through allowances for depreciation or amortization over the term of the underlying lease or in some instances, over the useful life of each improvement. Sec. 1.167(a)-4, Income Tax Regs.; sec. 178 and the regulations thereunder. These expenditures represent the cost of income-producing assets, and normally any unamortized balance is deductible by the lessee as a loss in the year the lease is terminated. Cassatt v. Commissioner,137 F.2d 745, 749 (3d Cir. 1943), affg. 47 B.T.A. 400 (1942). Where, however, an income-producing asset is distributed to shareholders upon liquidation, the rule is that no deduction for the loss of the unamortized balance of the cost of such asset may be taken by the liquidating corporation. Wolan v. Commissioner,184 F.2d 101 (10th Cir. 1950), affg. a Memorandum Opinion of this Court; Plaza Investment Co. v. Commissioner,5 T.C. 1295 (1945). The same rule of nondeductibility applies whether it is the leasehold improvements or the leases themselves that are distributed in liquidation. *401 Cooper Foundation v. O'Malley,221 F.2d 279 (8th Cir. 1955); Tom L. Burnett Cattle Co. v. Commissioner,T.C. Memo. 1960-15; 2 Mertens, Law of Federal Income Taxation, sec. 12.35, pp. 158-161 (1985). Petitioner contends that United is entitled to deduct the unamortized balance of its costs of the leasehold improvements upon the early termination of its leases in accordance with the general rule in Cassatt v. Commissioner, supra. Respondent contends that the net effect of United's actions in liquidation was to distribute its leases and all capital assets appertaining thereto to its sole stockholder. As such, respondent contends, the case herein is indistinguishable in principle from and thus controlled by the Wolan, Plaza Investment Co., Cooper Foundation, and Tom L. Burnett Cattle Co. line of cases. As we see it and as explained below, we think that the resolution of the issue herein is partly controlled by the Cassatt case and partly controlled by the other line of cases. At the time United adopted its plan of complete liquidation, United was the lessee under four separate leases covering buildings one through seven. *402 United made substantial improvements to buildings one, two, three, five, and seven while it was the lessee of these premises. [15] Prior to its liquidation, United was recovering the costs of these leasehold improvements through allowances for depreciation over the useful lives of the various improvements rather than amortizing the costs over the years remaining on the respective leases. [16]
At all times relevant to United's plan of liquidation, Mr. Byrne, United's sole stockholder, was the 100 percent owner and lessor of buildings one through six and a 50 percent owner and lessor of building seven. [17] Margaret O. Byrne, Mr. Byrne's former wife, and Mr. Byrne, as trustee of the Kathleen M. Byrne Trust, each held a *403 25 percent interest in building seven and the accompanying lease. Neither Mrs. Byrne nor the Trust was a shareholder of United at any time pertinent hereto. Accordingly, at the time United terminated its lease with respect to building seven, fifty percent of such building (together with fifty percent of the improvements relating thereto) was not attributable to Mr. Byrne but rather was owned by parties unrelated to United, i.e., Mrs. Byrne and the Trust. See n. 16, supra. Thus, when United terminated its lease on building seven, fifty percent of the improvements United made with respect to such building reverted to owners/lessors unrelated to United. Accordingly, consistent with the general rule set forth in Cassatt v. Commissioner, supra,137 F.2d at 749, we conclude that one-half of the balance of the unamortized leasehold expenditures attributable to building seven is deductible by United as a loss in the year it terminated the lease on such building.[18]
*404 However, with respect to the leasehold improvements relating to buildings one, two, three, and five and the other 50 percent of the leasehold improvements relating to building seven, we reach a different conclusion. Where income-producing capital assets, including leasehold improvements, are distributed to shareholders upon liquidation, the rule is that no deduction for the loss of any unamortized balance of the cost of such improvements may be taken by the liquidating corporation. Wolan v. Commissioner, supra;Plaza Investment Co. v. Commissioner, supra.The same rule applies where the lease itself is distributed to the shareholder/lessor. Cooper Foundation v. O'Malley, supra; Tom L. Burnett Cattle Co. v. Commissioner, supra.Applying this rule and relying upon this line of cases, we conclude that United is not entitled to deduct the balance of the unamortized costs of the improvements to buildings one, two, three, five, and 50 percent of the improvements relating to building seven. Petitioner, of course, disagrees, tries to distinguish this line of cases, and asks us to follow instead Strauss v. United States,199 F. Supp. 845 (W.D. La. 1961), *405 in which a district court reached a contrary result on somewhat similar facts. There were some significant factual differences in the Strauss case -- the taxpayer there was not wholly owned by its lessors and some of the shareholders received nothing for the cancellation of the lease and the loss of the unamortized balance of the leasehold improvements. In Strauss v. United States, supra, a corporation entered into a lease with three of its shareholders who together held two-thirds of its issued and outstanding stock. The lease was for 15-year term at an annual rental of $ 1,080 with no option to renew. Under the terms of the lease, the lessee corporation was obligated to construct a building on the property and to pay all taxes assessed against the property and improvements thereon. Upon termination of the lease, by expiration or otherwise, all improvements were to become the property of the lessors and no assignments or sublease of the premises could be made, in whole or in part, without the written consent of the lessors. Pursuant to the terms of the lease, the corporate lessee constructed a brick, steel, and concrete one-story, warehouse-type building *406 at a cost of $ 125,625.24. The lessee amortized the cost of the building over the remaining term of the lease, 14 years and several months, although it was reasonable to assume that the building would have a useful life in excess of that term. With seven years remaining on the 15-year lease, the corporation lost its liquor franchise rights for a nationally known supplier. The liquor franchise constituted approximately 75 percent of the corporation's total sales, approximately 90 percent of its total inventory, and approximately 100 percent of its total accounts receivable, since beer was sold only for cash. After unsuccessful attempts to secure a liquor franchise from another national supplier, the stockholders decided to liquidate the corporation. At the time of liquidation the three stockholders/lessors owned approximately 71 percent of the corporation's stock. One of the three stockholders/lessors incorporated the Falstaff Distributing Company for the purpose of acquiring and operating the beer business then being conducted by the liquidating corporation. The assets incident to the distribution and sale of Falstaff beer was sold to the Falstaff Distributing Company and the *407 balance was sold to third parties. The sole stockholder of the Falstaff Distributing Company was the liquidating corporation's largest single stockholder. The liquidating corporation and the stockholders/lessors mutually agreed to cancel the 15-year lease with the improvements reverting to the lessors under the terms of the lease. The lessors subsequently leased the property with the improvements thereon to the Falstaff Distributing Company. Strauss v. United States, supra,199 F. Supp. at 846-848. On those facts the district court concluded that the liquidating corporation had properly deducted on its final Federal income tax return the balance of its unamortized costs of the leasehold improvements. However, in Strauss the district court seemed to be addressing something akin to a sham or tax avoidance argument. In reaching its conclusion, the district court in Strauss found that the terms of the lease between the liquidating corporation and its stockholders/lessors was favorable to the corporation and therefore was not objectionable for tax purposes merely because the stockholder/lessors and the other corporate stockholders were related by blood or *408 affinity. In other words, there was no overreaching, and the rent was at least equal to what would have been paid by an unrelated lessee, at least fair market rental value. Moreover, the court found that bona fide business reasons prompted the lease cancellation and the subsequent liquidation and the court found no evidence of any scheme or collusion among the parties to effect a tax avoidance. The court reasoned that the stockholders/lessors regained possession of the leased premises and all the improvements thereon due to causes beyond the taxpayer's control. As such, simply because the lessors and lessee were related did not justify a departure from the general rule set forth in Cassatt v. Commissioner, supra, thereby allowing the corporate taxpayer to deduct on its final return the balance of the unamortized portion of the capital leasehold expenditures. Strauss v. Commissioner, supra, 199 F. Supp. at 855. The present case involves no suggestion of sham or a tax avoidance scheme. [19] The Strauss court seemed to conclude that the absence of sham or a tax avoidance scheme automatically triggered application of the Cassatt rule, and *409 if that is the basis for its conclusion, we must respectfully disagree. The absence of sham or a tax avoidance scheme goes only to the question of the bona fides of the lease agreement, not to the question of whether there is a deductible loss when the bona fide lease is terminated prematurely. The Cassatt case, it should be remembered, did not involve a lease between a lessor/stockholder and his wholly owned lessee/corporation at all. More importantly, the Cassatt case did not involve the liquidation of the lessee corporation with a distribution of the capital assets and/or lease to a lessor/stockholder. The taxpayer in Cassatt was a member of a partnership; the partnership terminated in liquidation over a period of years). The holding was that the unamortized balance of leasehold improvements was deductible, if at all, only in the year the lease was terminated. That is when the deductible loss was incurred in Cassatt. On the other hand, as the Wolan -- Plaza Investment Co. -- Cooper Foundation -- Tom L. Burnett Cattle Co. line of cases show, there is no deductible loss when the lessee-corporation is liquidated and the capital improvements and/or the leases *410 are distributed to the lessor/sole shareholder. *411 In Plaza Investment Co. v. Commissioner,5 T.C. 1295 (1945), the corporate taxpayer leased certain properties to unrelated third parties and incurred real estate broker commissions which it listed on the corporate books as "Prepaid Expenses" and amortized these expenses over the terms of the respective leases. Prior to the expiration of these leases, the corporation liquidated and distributed all of its assets to its stockholders as a liquidating dividend in kind. On its tax return for its liquidation year the corporation deducted as a business expense the unamortized balance of the brokerage commissions, which the Commissioner disallowed. In sustaining the Commissioner's determination, we reasoned that the corporate dissolution did not terminate the lease and the benefit from the expenditure would continue until the expiration of the term of the lease. [20]Plaza Investment Co., supra,5 T.C. at 1297. *412 In Wolan v. Commissioner,184 F.2d 101 (10th Cir. 1950), affg. a Memorandum Opinion of this Court, the lessor corporation leased an apartment house (Sevenorm lease) to another corporation for a term of 20 years and received advance rents under the lease in the amount of $ 35,000. The lessee corporation capitalized these advance rents and other lease expenses on its books and amortized them over the lease term. The lessor corporation subsequently acquired all the stock of the lessee corporation, which was thereafter completely liquidated in a tax-free liquidation with the lessor corporation receiving all of its assets. At the time of this liquidation, the unamortized balance of the lease expenses and the advance rents on the books of the lessee corporation was $ 32,727.65. Following the liquidation, the lessor corporation leased the apartment house to another third party for the term of 15 years (Wallach lease). The lessor corporation incurred lease expenses which it capitalized and amortized over the life of the lease at the annual rate of $ 443.88. The lessor corporation was subsequently liquidated and all of its assets were distributed to its stockholders. *413 At the time of the liquidation, the unamortized balance of the Sevenorm lease expenses was $ 25,311.99 and the unamortized balance of the Wallach lease expenses was $ 5,623.36, both of which the lessor corporation deducted in full on its final tax return. We sustained the Commissioner's disallowance of the deduction with respect to the unamortized lease expenses of the Sevenorm lease and the Wallach lease. Wolan v. Commissioner, a Memorandum Opinion of this Court dated October 11, 1949. The Tenth Circuit affirmed our decision. In Cooper Foundation v. O'Malley,221 F.2d 279 (8th Cir. 1955), the Cooper Foundation leased a theatre to the Interstate Corporation for a term of 25 years. Interstate paid the Cooper Foundation a premium of $ 117,458.35 in consideration of the 25-year lease. In the same year, the Cooper Foundation acquired all the stock of Interstate and the 25-year lease was canceled. Interstate was liquidated and all of its assets were distributed to its sole stockholder, the Cooper Foundation. The lease premium was set up on the books of Interstate as a capital asset but was deducted as an ordinary and necessary business expense on its final tax *414 return. In relying on the line of reasoning set forth in Plaza Investment Co. v. Commissioner,5 T.C. 1295 (1945), as applied and developed in Wolan v. Commissioner,184 F.2d 101 (10th Cir. 1950), the district court held that Interstate was not entitled to deduct the unamortized balance of the lease premium in the year of its liquidation. Cooper Foundation v. O'Malley,121 F. Supp. 438, 447 (D. Neb. 1954). The district court found that the cancellation of the lease was in substance a distribution in liquidation and a transfer of the interest covered by the lease to the foundation. Cooper Foundation v. O'Malley, supra,121 F. Supp. at 445, 446. On appeal, the Eighth Circuit determined that the trial court correctly held that the premium was not deductible in the year of liquidation. [21]
*415 In Tom L. Burnett Cattle Co. v. Commissioner,T.C. Memo. 1960-15, the corporate taxpayer made improvements to property it leased from its sole shareholder. Subsequently, the corporation liquidated and on its final return deducted the unamortized balance of the leasehold improvements. The Commissioner disallowed the deduction. In sustaining the Commissioner's determination, we indicated that the net effect of the taxpayer's actions in liquidation was to distribute its lease and all capital assets appertaining to it to its sole shareholder and lessor. Tom L. Burnett Cattle Co. v. Commissioner,T.C. Memo. 1960-15, 19 T.C.M. 94, 96, 29 P-H memo T.C. par. 60,015 at 60-118. As such, although factually different (distribution of lease rather than leasehold improvements as such) we found that transaction indistinguishable in principle from and thus controlled by Wolan v. Commissioner, supra, and Plaza Investment Co. v. Commissioner, supra.See also Cooper Foundation v. O'Malley, supra, which we cited and followed. Similarly, here the net effect of United's actions in liquidation was to distribute its leases pertaining *416 to buildings one, two, three, five, and fifty percent of building seven, and all capital assets appertaining thereto to Mr. Byrne, its sole shareholder and lessor of those properties. As such, we find these actions also controlled by the Plaza Investment Co., Wolan, Cooper Foundation, and Tom L. Burnett Cattle Co. cases so that no deduction for loss is allowable to petitioner. Petitioner maintains that the instant case is distinguishable from the Plaza Investment Co., Wolan, and Cooper Foundation cases discussed above, and presumably also from the Tom L. Burnett Cattle Co. case. Specifically, petitioner contends that unlike the leases in Wolan and Plaza Investment Co., United's leases were not distributed in kind to its shareholder in the course of complete liquidation but were terminated by mutual consent. We addressed that issue in Tom L. Burnett Cattle Co. v. Commissioner, supra, and adhere to our position in that case. Since United's sole stockholder was also the owner and lessor of the properties covered by the subject leases, whether United terminated or distributed these leases is a distinction without a difference. In either *417 event, United relinquished and transferred its leasehold interests in the leased premises and the improvements thereon to Mr. Byrne, United's sole stockholder. Petitioner contends that the Wolan case is further distinguishable from United's situation in that the shareholder/lessor/distributee in Wolan continued to operate the same business activity previously carried on by the liquidating corporation and continued using the leasehold in the operation of that business. Petitioner argues since United ceased business activities, terminated rather than distributed its leases, sold rather than distributed its operating assets, and the shareholder did not continue the business of the corporation after liquidation, the principle of Wolan does not apply and United may charge off the unamortized balance of the cost of the leasehold improvements. Those factors were not determinative in Wolan and we do not consider them determinative herein. Moreover, after the final distribution in Wolan the shareholder/lessor did not continue to operate the business. Petitioner further argues that Cooper Foundation is also distinguishable in that no bona fide business purpose *418 existed for the transaction in Cooper whereas the transactions herein were motivated by bona fide business reasons. Moreover, in Cooper Foundation, a 25-year lease was canceled only five months following its execution, whereas United's leases were terminated after substantial portions of the lease terms had elapsed. Once again those factors were not determinative in Cooper Foundation and we do not consider them determinative herein. [22] See our opinion in Tom L. Burnett Cattle Co. v. Commissioner, supra.
Mr. Byrne, United's sole stockholder, was the 100 percent owner and lessor of buildings one, two, three, and five and a 50 percent owner and lessor of building seven. United, while the lessee of these premises, made substantial improvements to the premises and recorded the costs of these improvements on its *419 books as capital expenditures. Prior to its liquidation, United was recovering these costs through allowances for depreciation over the useful lives of the various improvements. When United terminated these leases on the above-mentioned properties and liquidated in a tax-free transaction, Mr. Byrne, as United's sole stockholder and sole owner of such properties, acquired United's leasehold interests in these premises and the improvements thereon. United did not suffer a loss as in Cassatt v. Commissioner, supra. To allow United to deduct the balance of the unamortized costs of its leasehold improvements upon early termination of its lease would afford United an unwarranted tax benefit. In effect, United distributed to its sole stockholder the right to use these leasehold improvements for the remaining period of their depreciable useful lives. [23] See James Armour, Inc. v. Commissioner,43 T.C. 295, 311 (1964). Moreover, the early terminations enabled Mr. Byrne to negotiate new leases on these properties with the purchasers of United's assets and recover substantially higher rental payments due to the improvements made by United. It would indeed *420 be anomalous to allow United to deduct as a loss the balance of the unamortized costs attributable to the future use of such improvements when United distributed its right to such future use of its sole stockholder in the course of a tax-free liquidation. See section 336. Cf. Hillsboro National Bank v. Commissioner,460 U.S. 370 (1983), revg. and remanding Bliss Dairy, Inc. v. United States,645 F.2d 19 (9th Cir. 1981). Accordingly, since the net effect of United's action in liquidation was to distribute its leases and all capital assets appertaining to buildings one, two, three and five and 50 percent of building seven to its sole stockholder and lessor, United is not entitled to deduct the balance of the unamortized leasehold improvements on such properties upon the early termination of these leases. [24]
*421 For all of the foregoing reasons, we adhere to the Plaza Investment, Wolan, Cooper Foundation, Tom L. Burnett Cattle Co. line of cases. If the Strauss case is not distinguishable on its facts, we decline to follow it. To reflect the concessions and our holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. Mr. and Mrs. Byrne were divorced in 1965.↩
3. This law was enacted on November 2, 1976 with an effective date of December 3, 1978. ↩
4. Some trade journals in the mid-seventies alluded to the possibility that Miller would soon overtake Budweiser as the number one seller of beer. ↩
5. On or about September 8, 1976, United filed a Form 966, Corporate Dissolution or Liquidation, and related documents with the Internal Revenue Service Center at Cincinnati, Ohio concerning its section 337 plan of liquidation. ↩
6. United acquired this lease from Brewers and became the successor tenant following the liquidation of Brewers in a section 332 liquidation. ↩
7. Because Mr. Byrne held other beer distributorships in Michigan, the lease could not be in this name because it would violate rules and regulations of the Michigan Liquor Control Commission. ↩
8. Negotiations between United and Wolpin first began in March or April of 1976. Mr. Byrne and Frederic Weber on behalf of Wolpin met at the Detroit Athletic Club to discuss the possible purchase of United's beer distributorships by Wolpin. This meeting was arranged through a business broker in Boston who contacted Mr. Weber. Wolpin was only interested in acquiring United's Budweiser distributorship. ↩
9. The instrument was notarized on October 30, 1976, but the terminations became effective as of October 15, 1976. ↩
10. In or around November of 1977, Wolpin entered into an oral arrangement to rent building four at a rental rate of $ 1,000 per month. On or about July 25, 979, Wolpin and Margaret O. Byrne executed a "First Modification Of Lease," which amended the October 15, 1976 lease between Wolpin and Margaret O. Byrne to include building four for an increased rental of $ 1,500 per month. ↩
11. The stated purchase price for the stock acquisition was $ 4,437,000 increased or decreased by the increase or decrease in the book value of United from February 28, 1977 to the date of closing. The book value took into account the amount of all tax refunds for income taxes, single business taxes, and all other taxes based on income. ↩
12. The minor difference in these two figures relates to another matter that the parties have no apparently resolved. ↩
13. The parties have stipulated that petitioner is a transferee within the meaning of section 6901 and, as such, is liable for deficiencies in income tax, if any, due from United for any of the years in issue. Petitioner through its president executed a Transferee Agreement (Form 2045) acknowledging it was the transferee of United's assets within the meaning of section 6901. ↩
14. Respondent also disallowed $ 1,200 claimed as a miscellaneous expense on United's 1976 tax return since such amount represents traffic fines which are not ordinary and necessary business expenses within the meaning of section 162. This issue was not raised or discussed in the petition, at trial, or in petitioner's briefs, and thus is deemed to be conceded. Rule 34(b)(4). In addition, respondent determined that United did not sustain net operating losses in the taxable years 1976 and the short taxable year ended July 15, 1977 and, as such, United had no operating loss carrybacks to the prior years 1973 and 1974. As a result, the Forms 1139 (Application for Tentative Carryback Adjustment) filed by petitioner on United's behalf resulted in erroneous tentative allowances of $ 25,477 and $ 69,711 for the years 1973 and 1974, respectively. Resolution of this issue appears purely computational and depends on whether United is entitled to deduct for the taxable years 1976 and 1977 (ended July 15, 1977) the undepreciated balance of its costs of leasehold improvements in the amounts of $ 184,992 and $ 168,996, respectively, the losses that generated the net operating loss carrybacks to the taxable years 1973 and 1974. ↩
15. We note that United made no improvements with respect to buildings four and six. ↩
16. There is no dispute in this case that United was properly recovering the costs of these improvements over the useful lives of the improvements rather than over the terms of its leases. See section 178. That is because United would have continued to lease the buildings beyond the lease termination dates had it not liquidated its beer distributorships. See n. 23, infra.↩
17. Although on or about September 16, 1976, Margaret O. Byrne, for reasons not relevant to our determination of the issues before the Court, was substituted for Robert F. Byrne as the named lessor on all four of the then existing leases to United covering buildings one through seven, the parties have stipulated that at all times relevant to United's plan of liquidation and the issues presented herein, Mr. Byrne was the 100 percent owner and lessor of buildings one through six and a 50 percent owner and lessor of building seven. See n. 7, supra. Margaret O. Byrne was a 25 percent owner and lessor of building seven and Mr. Byrne, as trustee of the Kathleen M. Byrne Trust, was a 25 percent owner and lessor of building seven. We note that at the time Mr. Byrne transferred a one-quarter interest in building seven to the Kathleen M. Byrne Trust for the benefit of his daughter, all the improvements made by United with respect to building seven had been completed. Although Mr. Byrne retained the reversionary interest in this Trust, respondent has not contested the Trust's validity, and we assume respondent does not consider Mr. Byrne the owner of any portion of the Trust for purposes of section 673(a). Consequently, solely for purposes of this case, we recognize the validity of this Trust and we shall not treat Mr. Byrne as the owner of the one-quarter interest of building seven that he transferred to the Trust in April of 1975. ↩
18. On October 15, 1976, United terminated its leases on buildings five and seven. On its U.S. Corporation Income Tax Return (Form 1120) United claimed and respondent allowed the yearly amortization (depreciation) for the leasehold improvements on buildings five and seven. In addition, United reported a loss in the amount of $ 184,992 representing the balance of the unamortized leasehold expenditures for buildings five and seven. Of this amount, only $ 27,294 was attributable to improvements to building seven. Thus United is entitled to deduct one-half of $ 27,294 on its 1976 tax return. What United lost was the use of the improvements, but since United never owned those improvements, we do not reach respondent's alternative argument under section 337. ↩
19. In distinguishing our Tom L. Burnett Cattle Co. case, the district court in Strauss stated: [T]he net effect of the transaction herein questioned is now shown to have been within the rule announced in Tom L. Burnett Cattle Co., T.C. Memo. 1960-15, citing Wolan v. Commissioner, 184 F.2d 101 (10 Cir., 1950), 58th St. Plaza Theater v. Commissioner, 195 F.2d 724 (2 Cir., 1952), cert. den. 344 U.S. 820, 73 S. Ct. 17, 97 L.Ed. 638, and Cooper Foundation v. O'Malley, 221 F.2d 279 (8 Cir., 1955).
Strauss v. United States, supra,199 F. Supp. at 853. In Tom L. Burnett Cattle Co. v. Commissioner,T.C. Memo. 1960-15, we cited and relied on Plaza Investment Co. v. Commissioner,5 T.C. 1295 (1945), not 58th Street Plaza Theater v. Commissioner,195 F.2d 724 (2d Cir. 1952). These two cases are totally unrelated. The issue decided in 58th Street Plaza Theater is unrelated to the issue we decided in Tom L. Burnett Cattle Co. The 58th St. Plaza Theater↩ case involved instead a sham situation where the taxpayer corporation leased property for no business purpose to one of its stockholders at less than fair rental value as part of an arrangement to give a family member additional income without payment of tax thereon by the corporation. 20. In reaching our conclusion, we distinguished the case of S & L Building Corporation v. Commissioner,19 B.T.A. 788 (1930), revd. 60 F.2d 719 (2d Cir. 1932), revd. 288 U.S. 406↩ (1933), where we held that the taxpayer was entitled to deduct the unamortized balance of an expenditure made to procure a mortgage assumed by the purchaser of the property. We noted that such expenditure was not made to acquire an income-producing asset, but an expense in connection with the creation of a liability. 21. However, the district court had not passed upon the question of whether Interstate and Cooper Foundation, as its successor, were entitled to deduct an aliquot part of the $ 117,458.35 premium in the year of liquidation. The Eighth Circuit remanded the case with directions to allow a deduction for the aliquot portion of the premium for the liquidation year. Cooper Foundation v. O'Malley,221 F.2d 279, 281↩ (8th Cir. 1955). Here, there is no question about the deductibility of such an aliquot portion, the Commissioner having allowed the annual depreciation deduction in the year of liquidation. 22. We note that the Strauss court tried to distinguish Coopoer Foundation on the ground that the taxpayer in Strauss, unlike the taxpayer in Cooper, was not wholly owned by its lessors, 199 F. Supp. at 854↩. Such a distinction could not avail this taxpayer which is wholly owned by its lessor/sole shareholder. 23. We note that United's leases provided for five-year terms, and except for a standard month-to-month holdover clause, contained no option to renew. However, due to the substantial nature of the improvements, the relationship between United and its lessor, and the fact that the improvements would revert to the lessor/stockholder upon termination of the leases, we are convinced that the improvements were intended to benefit United at least throughout the depreciable useful lives of the improvements. Indeed, Mr. Byrne admitted at trial that United would have continued to lease these properties had United not been liquidated. Thus, it is reasonable to conclude that United distributed to Mr. Byrne the right to use the improvements for the remaining period of their useful lives. ↩
24. Since Mr. Byrne is not a taxpayer before this Court, we express no opinion concerning his right, if any, to claim depreciation in subsequent years with respect to those unamortized leasehold expenditures. See Wolan v. Commissioner,184 F.2d 101 (10th Cir. 1950). Also, the record does not indicate whether or not Mr. Byrne reported capital gains on the improvements at the time of the liquidation, as did the shareholders/lessors in Strauss v. United States, supra,↩ but if so he then received the benefit of a stepped-up basis in such improvements.